**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

ROSARIO A. FIORANI, JR.                    :
     PLAINTIFF, PRO-SE                    :

     v.                    :    CIVIL ACTION NO: 06 - 0739 RWR
                         :

UNITED STATES OF AMERICA                    :
DAVID HACKNEY, ESQ.,                    :
GLEN A. TRIMPER, ESQ.                    :
INTERNAL REVENUE SERVICE AGENTS    :
  JOHN WANAT, SPEC. AGT. CID;  AND    :
  KEVIN DAVIES, SPEC. AGT, CID         :
AND                    :
  JASON MINARD                    :
      DEFENDANTS, ET AL    :

**RECEIVED**

SEP 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### PLAINTIFF'S REPLY AGAINST THE GOVERNMENT'S MOTION TO DISMISS

    COMES NOW Plaintiff Pro-Se to respectfully submit to this Court his reply to the

Government's Motion to Dismiss pursuant to Federal Rules of Civil Procedure, Rule 12(b) (1),

(3) and (6).  Plaintiff disputes, denies and challenges the Government's claims, misstatements

and assertions, alleged as facts, set forth in their Motion to Dismiss.

    Plaintiff provides facts, evidence, 'exhibits'[1] and THIRD-PARTY documents that

respectfully demand this Court  deny the Government's Motion to Dismiss and assertions of

sovereign and qualified immunity based on Plaintiff's facts, evidence, 'exhibits' and THIRD-

PARTY documents showing the Government's own agents, witnesses, AUSA and judge

committed all those criminal and civil violations of laws, as outlined and evidenced herein below.


### FACTUAL BACKGROUND CONTRARY TO GOVERNMENT'S MOTION

    From October to December 1997, Plaintiff was employed on a contract basis with the

Federal Housing Administration, (FHA) through a contract with the Fair Housing Counsel of

---

    [1].  **THE FIRST 12 EXHIBITS ARE CALLED C-#".  The next 15 exhibits will be called, "N-#".**
Plaintiff submitted 12 exhibits to this Court on Plaintiff's reply to and against defendant TRIMPER'S motion
to this Court.  Plaintiff asked this Court to "merge" his reply with those 12 exhibits to TRIMPER'S motion
into this reply to the Government's Motion to Dismiss.  Plaintiff is now submitting 15 (more), (new) exhibits,
that TRIMPER failed to use against the Government's –illegal search and seizure–, –unconstitutional
indictment–, and forced, threatened and coerced guilty plea contrary to Rule 11 of the Fed. R. Cr. P..

Washington, (FHC). Plaintiff needed a new car and began to shop around at car dealers after work and on weekends.

On or about December 17, 1997, Plaintiff went to Crystal Ford in Montgomery County, Maryland to look at cars in their lot.

On December 19, Plaintiff returned to look again at what the dealership had on its lot. While there, a salesman worked with Plaintiff to locate and sell him a car. That evening, the salesman faxed to Plaintiff the paperwork for a specific car. The car was a 1997 Ford Crown Victoria[2]. (Pltf's Exh. N-1a).

On Saturday, December 20, Plaintiff went to Crystal Ford to sign the papers and contract to purchase that car. (Pltf's Exh. N-1). MINARD called himself, "Director of Used Cars" at Crystal Ford. MINARD handled the final sale of the car. After signing of papers, Plaintiff was to take delivery of the car, but MINARD told Plaintiff to return Monday, (December 22) to take delivery of the car. MINARD told Plaintiff he had to have the car processed before Plaintiff can take delivery. (Pltf's Exhs. N-1a-d, 2a and b, and N-4).

At about October 1997, Plaintiff learned his father had lung cancer[3]. After learning of his father's terminal cancer, Plaintiff started to go into a slow depression and anxiety over the possibility of losing his father. Plaintiff is diabetic, taking several types of diabetic medication and ADD medication.

On December 22, Monday, Plaintiff returned to Crystal Ford to pick up his purchased car. It was at that time Plaintiff learned his salesman MINARD resold the car to another person. The

---

[2]. There are no laws prohibiting the sale or purchase of this car, contrary to what the Government has alleged for more than seven (7) years; and, where the Government has continued to allow repeatedly deliberately false, intentionally misleading and fabricated facts regarding this legitimate purchase on December 19 and 20, 1998.

[3]. From October 1997 to February 2001, Plaintiff's father would get three types of cancer which would take his life on February 13, 2001. Plaintiff and his (now deceased) father were very close, thus Fiorani, Sr. and Fiorani, Jr..

salesman would not identify the person, nor did the dealership disclose any information about the resale.  Crystal Ford did not tell Plaintiff who the second buyer was.

On or about December 24, Plaintiff filed consumer complaints with the Maryland States Attorney General's Office, FTC, Montgomery County Consumer Protection Office and Fairfax County, (Virginia) Consumer Affairs Office to get the car returned and second sale rescinded against the dealership under Virginia and Maryland consumer protection and UCC laws. (Pltf's Exh. N-6).

From on or about December 24, 1997 to about January 12, 1998, Plaintiff learned that the car was resold to a Manassas, Virginia man named James Metcalfe, Jr. for about $2,000 more than what Plaintiff bought the car for under the signed contract.  Plaintiff continued his legal challenges against MINARD and Crystal Ford.  Eventually, Plaintiff filed a suit against Metcalfe who had known about Plaintiff's prior sales contract for the car. (Pltf's Exh. N-1b-d).

On Saturday morning, January 10,1998, MINARD called Fiorani's home telephone and beeper numbers. (Pltf's Exh. N-15 #13)   MINARD made clear verbal threats to and against Fiorani, saying he intended to cause bodily, emotional, and employment harm, and MINARD "implied" he would cause Fiorani personal injury to his reputation in ways MINARD did not clearly explain how MINARD intended to cause (Fiorani and his family) harm . MINARD made direct references to the consumer complaints filed against him as MINARD'S basis for threatening Fiorani and his family, (MINARD and Crystal Ford).  After MINARD'S threatening telephone call[4] Plaintiff called Fairfax County Police to file a criminal telephone threat report against MINARD. Plaintiff used his notes of MINARD'S threatening telephone call.  Plaintiff sent copies of his

---

[4]. 18.2-427, Use of profane, threatening or indecent language over public airways.  If any person shall use obscene, vulgar, profane, lewd, lascivious, or indecent language, or make any suggestion or proposal of an obscene nature, or threaten any illegal or immoral act with the intent to coerce, intimidate or harass any person, over any telephone or citizens band radio in this Commonwealth, shall be guilty of a Class 1 misdemeanor.

notes to the federal and state agencies under Virginia's Criminal Code section, 18.2-427. (Pltf's Exh. N-7a-b).

Between December 26, 1997 to January 24, 1998,Plaintiff sent letters, disputing and contradicting, MINARD'S deliberately false assertions and claims (fabricated and manufactured) with the help of IRS agent's WANAT and DAVIES to the Montgomery County Consumer Protection Investigator. (Pltf's Exh. N-6).

On February 5, 1998, two IRS, (TIGTA) agents John WANAT[5] and Kevin DAVIES deceptively applied for and obtained three (3) search warrants that contained purposely false, willfully manufactured and inaccurate statements in an affidavit. The affidavit lacked any probable cause. It was issued by District Magistrate Judge Buchanan who was not a detached nor neutral judge at the time she signed and approved the affidavit. (Pltf's Exh. N-5, ¶10).

On February 6, 1998, at 5:55 a.m. Plaintiff was awakened by a telephone call from an unknown person asking for a Mr. Jones. Plaintiff's paid (defense) counsel GARDINER and DUBE learned that the call was made by IRS agent WANAT. Immediately, there was a loud banging on the front door. As Plaintiff opened the door, he was swarmed by about seven (7) to about ten (10) persons, who directed flashlights and high-beam lights into Plaintiff's eyes, while Plaintiff was being handcuffed. Those persons were later identified as seven (7) IRS agents with about three (3) Fairfax County Police officers. Several agents picked Plaintiff up by the arms and moved him to the center of the living room while he was in his underwear. Once In the living room, an Agent identified himself as IRS agent John WANAT. (Pltf's Exh. N-7).

Two agents moved Plaintiff to the dining room table while he was still handcuffed. Plaintiff was never given his Miranda warnings, while Plaintiff was kept surrounded by about

---

[5]. Agent Wanat was revealed by Plaintiff's 1992 defense attorney, Larry DUBE, Jr., to be the primary person who had tried to get Fiorani (unlawfully) terminated from IRS, where that termination was reversed by MSPB because of IRS misconduct committed by Cynthia who had usurped her authority at the IRS while filling in for Peter Greenfield.

three agents for about the entire six hours.  Over those six hours, Plaintiff was continuously

questioned by at least two IRS agents and three other times, not given *Miranda* warnings.

Plaintiff told Agent WANAT to call his lawyer John HILLSMAN[6].   No agents allowed Plaintiff to

call anyone, nor was Plaintiff allowed to tell anyone what was happening. (Pltf's Exh. N-7).

By about 12 noon, the agents left.  Before WANAT left, he gave Plaintiff several pieces

of paper.  It was determined to be a copy of the three (3) search warrant's.  But no warrant

affidavit was given to Plaintiff, as required by law.  Plaintiff was provided a list of seized items

taken by the IRS, handwritten by someone.

Immediately, Plaintiff called Mr. John HILLSMAN Esq., first, getting immediate advice

from him on what to do. (Pltf's. Exhs. N-1, 7).  Plaintiff called his father.  Plaintiff learned his father

had tried three (3) times to call him.  Each time Fiorani, Sr. called, someone hung up on him.

(Pltf's Exh. N-3).

On and about February 6 and 7, 1998, Plaintiff and his wife drove to Westminster,

Maryland to meet his father.  They then drove to meet the cousin/nephew, Assistant District

Attorney, (ADA) Jason League, Esq., (Baltimore County States Attorney's Office) for legal

advice, guidance and directions on what to do and how to handle the unlawful and

unconstitutional IRS raid.

On or about February 10, Mr. HILLSMAN called Plaintiff to ask how he is doing.  In their

conversation, HILLSMAN told Plaintiff he has a friend who can assist Plaintiff with some of his

legal questions and information.  Can he, (Mr. HILLSMAN) call him and give his friend

(Plaintiff's) home telephone number?  Plaintiff agreed.  Thereafter, Plaintiff got a telephone call

from a man who did not identify himself.  But, asked Plaintiff a lot of questions about his

---

[6].  Mr. John Hillsman, Esq., Gagliardo & Zipin, Silver Springs, MD. was representing Plaintiff in a
case where MINARD and WANAT called Fiorani's employer, National Association of Securities Dealers, in
Rockville, MD,, preventing Fiorani from getting employed after the FHC job ended in December, 1997.

immediate situation, asking Plaintiff to tell him –exactly– what happened, leaving no details out. Plaintiff was told (this man[7]) would be taking notes and trying to help as much as possible, but he needed to know all the pertinent and specific facts. (Pltf's Exhs. C-7, 9-11 and N-1 to 7, 13).

On February 18, 1998, Plaintiff's family hired criminal defense attorney Richard GARDINER, Esq. to challenge the unconstitutional search warrants and illegal raid based on an illegal search affidavit's deceptively falsified, manufactured, purposely vindictive and retaliatory criminal actions by MINARD, GONZALEZ, and agent WANAT on the sole allegation Fiorani impersonated an IRS agent under 18 U.S.C. § 912. (Pltf's. Exhs. C-7, 9-11 and N 1 to 7). Once hired, GARDINER called Plaintiff's former 1992 attorney Larry DUBE, Jr., Esq..

Between February 20 to about August 1998, Plaintiff, DUBE and GARDINER with specific help from Mr. HILLSMAN'S friend, USADAG Stewart TSONOFF, all worked side-by-side to collect large amounts of facts, exhibits, information and THIRD-PARTY documents relating to the ulterior motivations, retaliations, and criminal conspiracy(ies) entered into between MINARD, GONZALEZ, DAVIES and WANAT. (Pltf's Exh. N-15 including C-12). Plaintiff and his attorneys gave a filing to TRIMPER, showing prosecutorial and judicial misconduct committed by AUSA David HACKNEY against the Government's unconstitutional search and seizure affidavit. See Plaintiff's Motion to Dismiss (Pltf's Exh. N-10).

---

[7] From on or about February 1998 to as late as November 2005, Plaintiff would get telephone calls from this person, soon in 1999, Plaintiff learned was Stuart Tsonoff, an USADAG under John Ashcroft, (United States Attorney General's Office).

6

In or about August 1998, GARDINER told Plaintiff he spoke to AUSA Robert CHESTNUT. GARDINER said, because of the many fact-specific evidence and THIRD-PARTY documents given to CHESTNUT to review showing a denial of Plaintiff's 4th, 5th, 6th, and 14th Amendments rights violations, and challenges to WANT'S unconstitutional IRS raid. That included the many false statements in the warrant affidavit that lacked probable cause, which included facts and evidence-documents showing a knowing intent of perjury, manufactured claims made by MINARD and GONZALEZ, that there is not going to be any indictment filed.

Converse to (former) AUSA CHESTNUT'S assurances made to GARDINER before September 9, 1998, Plaintiff was unlawfully indicted on five (5) concocted and manufactured felony counts. (Pltf's. Exh. N-4) CHESTNUT told GARDINER that § 912 was dismissed because it was found to be falsified by CHESTNUT, and there is on no-evidence to proceed on the § 912. HACKNEY did unconstitutionally falsify, manufacture, alter and concocted four (4) other — felony counts– that never happened nor occurred, but was handed down by a grand jury on HACKNEY'S (prosecutorial misconduct) and CACHERIS' (judicial misconduct). (Pltf's Exhs. N-4a-d). The facts showed agents WANAT and DAVIES, with MINARD'S and GONZALEZ's perjured and manufactured, "altered" evidence, illegally used it in the search warrant affidavit. (Pltf's Exh. N-5).

On September 10, 1998, at about 7 a.m., Plaintiff was arrested on an arrest warrant issued by District Judge CACHERIS. The arrest was conducted by IRS agents WANAT and DAVIES with two other unidentified agents. Plaintiff was taken to District Court on the arrest warrant issued by District Judge CACHERIS. (Pltf's. Exh. N-7).

On September 15, Plaintiff's hired family attorney, Mr. Richard GARDINER, Esq. was denied by Magistrate Judge Buchanan to represent Plaintiff on the five (5) criminal charges. Instead, Magistrate Judge Buchanan appointed Glen TRIMPER under CJA § 3006A to

7

represent Plaintiff. From that date forward, Plaintiff and TRIMPER never got along. They consistently fought argued, and TRIMPER repeatedly ignored, failed to act, or refused to dispute any of the manufactured, altered, concocted and perjured, false Government's witnesses' claims, statements, evidence, and THIRD-PARTY documents that proved Plaintiff is innocent of any crimes. (Pltf's Exhs. C-1 to 12, and N-1 to 15).

By the end of September 1998, defense attorney (either GARDINER and/or DUBE with the help of USADAG TSONOFF hired an investigator to interview three (3) of the grand jurors. One of the grand jurors was Ms. Monica Morrison, grand juror forewoman on the illegal and unconstitutional actions that happened in the grand jury room by HACKNEY and District Judge CACHERIS, where both of them allowed witnesses to commit perjury, HACKNEY and Agents WANAT or DAVIES altered (Pltf's. Exh. 4) and distorted documents and MINARD and/or GONZALEZ committed perjury in the grand jury from which an unconstitutional indictment was handed down.

From September 15 to May 2002, TRIMPER (1) repeatedly failed to perform any defenses; (2) Refused to do any investigations against AUSA HACKNEY'S misconduct; (3) Repeatedly failed to conduct any adverse interviews against MINARD and GONZALEZ, and refused to interview any of Plaintiff's witnesses; (4) Deliberately ignored or refused to challenge any of HACKNEY'S, the government's allegations, evidence, document; (5) TRIMPER deliberately refused to work with ay of Plaintiff's other attorneys; and Plaintiff's –best government– friend, USADAG TSONOFF to dispute, challenge and deny all of HACKNEY'S distorted, altered, manipulated and perjured criminal charges. (6) Nor did TRIMPER put forth any facts from any defense's criminal investigations that was obtained by and from DUBE, GARDINER and USADAG TSONOFF first, causing far more serious prejudices to Plaintiff's

8

physical, mental and emotional well-being as Plaintiff's (non-paid) court-appointed criminal defense counsel, CJA § 3006A.  (Pltf's. Exh. 10).

Before or about October 24, Plaintiff, his family and his paid attorneys demanded TRIMPER file for a suppressions hearing and file motions to dismiss the indictment on gathered documents showing there was perjury and manufactured evidence put forth to the grand jurors.

On or about October 24, TRIMPER finally filed for a Suppressions hearing, but failed to file any motions to dismiss the indictment on collected facts, evidence, exhibits and THIRD-PARTY documents showing perjury, manufactured evidence, malicious prosecution by AUSA HACKNEY on behalf of WANAT, MINARD and GONZALEZ.

On October 30, 1998, a suppressions hearing was held in District Court by District Judge Lee[8]. The suppression hearing was a total loss for Plaintiff. TRIMPER was totally deficient, knowingly defective, willfully ineffective and inadequately prepared on Plaintiff's behalf, as a court appointed defense attorney.  Due to TRIMPER'S repeated lack of being prepared, Plaintiff's defenses were a total loss, losing his 4th, 5th, 6th and 14th Amendments' Constitutional and Civil Rights.  (Pltf's. Exh. 10).

After the suppressions hearing, Plaintiff and his family met TRIMPER in his office. Plaintiff[9] was very nervous, anxious, demoralized, depressed and worried about Plaintiff's bad court-appointed attorney; and his father's failing health during the family meeting with TRIMPER, demanding TRIMPER file an appeal of the Judge's ruling.  TRIMPER outright refused, demanding Plaintiff plead guilty instead.  TRIMPER said he does not file any appeals.  Plaintiff

---

[8].  About two (2) years later, In 2000, the Supreme Court reversed the Fourth Circuit Court of Appeals in Dickerson v. United States, 530 U.S. 428 (2000), reversing too, District Judge Cacheris's order that Dickerson did not need to have Miranda warnings given by FBI agents during an in-custodial questioning.  Then in Williams v. Taylor, 529 U.S. 362 (2000), The Fourth Circuit was again reversed by the Supreme Court.

[9].  Prior to this time Plaintiff was heavily medicated and he was placed by a doctor on various anti-depressants, which include Zoloft, Wellbrutrin and Paczil, along with Plaintiff's diabetes medication.

continued to yell  he was innocent. and TRIMPER needed to file some  legal documents to challenge the search warrant's affidavit and indictment. TRIMPER refused to do anything Plaintiff and his family demanded of TRIMPER to challenge the indictment and search warrant affidavit. (Pltf's. Exhs. C-1 to 12 and 1-15).

Between October 30 and November 1, TRIMPER continued to call Plaintiff's home harassing him, and telling Plaintiff, "he has to think about a entering a plea." "Taking a plea" and "he should discuss taking a plea."  Each time Plaintiff refused, yelling back at TRIMPER that he is innocent!!  Plaintiff will not plead to something he did not do.  (Pltf's Exh. N-11, 14, 15). TRIMPER got more aggressive towards Plaintiff.  By this time, Plaintiff was taking many different kinds of anti-depressant medications, and Plaintiff was not sleeping well over the past six (6) to seven (7) months.

On October 31, 1998, TRIMPER and HACKNEY drafted a plea agreement without Plaintiff's knowledge, consent nor acceptance that Plaintiff was not allowed to  read, dispute or challenge that made purposely false representations of law and facts that did not ever happen nor occurred. (Pltf's Exh. N-15, #3).  That concocted plea agreement was later incorporated by TRIMPER and HACKNEY into a Statement of Facts that contained not less than 12 false, incorrect, intentionally manufactured claims and statements that never happened, was not illegal, and that Plaintiff would had promptly disputed had he had proper effective 'court' appointed defense attorney. (Pltf's. Exh.  N-1

On November 2, 1998, TRIMPER and HACKNEY took Plaintiff to court where he was taken to a side court room and forced, coerced, intimidated and threatened to sign a plea agreement and Statement of Facts.  HACKNEY, TRIMPER and CACHERIS played a direct part in Plaintiff not getting a copy of the document(s) he was forced to sign before CACHERIS. TRIMPER and HACKNEY kept Plaintiff from ever reading it, disputing it or challenging it in

10

anyway. Judge CACHERIS knew about it, played a direct part in their plans and scheme to get

Plaintiff to plead guilty, allowing TRIMPER and HACKNEY to use back-room tactics. (Pltf's.

Exhs. C-4).

After the hearing, Plaintiff called his father, TSONOFF, GARDINER and DUBE on what

happened. Plaintiff's [paid] counsel told Plaintiff what to do. That night, Plaintiff and his father

went to see ADA League to discuss what happened, and what to do about Plaintiff being forced,

coerce and threatened by TRIMPER and HACKNEY from October 30, to November 2, 1998, to

plead guilty to crimes that never happened, based solely on perjured facts, evidence and false

testimony unconstitutionally admitted by CACHERIS in the grand jury. Plaintiff told each of

them he was not given any copies of the alleged documents he was forced to sign before Judge

CACHERIS. (Pltf's Exh. N-15, #3).

On Tuesday, November 3, Plaintiff got a copy of the two documents from the District

Court Clerk that TRIMPER and HACKNEY never gave him. Plaintiff and his paid defense

attorneys saw that TRIMPER and HACKNEY had forced, coerced and demanded Plaintiff sign a

knowingly false, inaccurate and materially misleading legal document at the top of the page, but

did not let Plaintiff read it, challenge it, dispute it, where both documents contained not less than

12 false statements. TRIMPER and HACKNEY knew those statements were false and

HACKNEY had manufactured them about four (4) months before any such indictment.

After November 3, 1998, to this date, September 4, 2006, Plaintiff has repeatedly tried to

get the involuntary, by force, coercion, threats and intimidation plea withdrawn by the Court, or a

reversal of the knowingly deliberate wrongful and unconstitutional conviction by the District Court

or an Appellate Court reversed or set aside. Indeed, CACHERIS has repeatedly intervened to

keep Plaintiff's unconstitutional plea from ever being reversed on Constitutional grounds

because there are fact-specific evidence, information, THIRD-PARTY documents and exhibits

that he was a part of it and participated directly and indirectly in the unconstitutional plea. (Pltf's. Exhs. C-1 to 12 and N-1 to 15).

On, about and after December 20, 1998, Plaintiff attempted to make contact with District Judge CACHERIS, regarding CACHERIS' prior knowledge, awareness of, and CACHERIS' permission of the 12 false, misleading and inaccurate claims contained in the SOF.  Plaintiff Pro-Se used and has continued to use due diligence in getting a new court-appointed attorney, not TRIMPER; and a new court appointed appellate attorney on the Fourth Circuit's Order to TRIMPER and the District Court Judge CACHERIS, for TRIMPER to file Plaintiff's first appeal, as of right.  (Pltf's Exh. C-1).

Before January 28, 1998, an Order was sent to Plaintiff's home by District Judge, T.S. Ellis, III, ordering Fiorani, TRIMPER and AUSA, HACKNEY to appear before him in his courtroom.  (Pltf's. Exh. C-12a, b and c).  Plaintiff appeared.  But, TRIMPER and HACKNEY did (ignore) and did not appear.

On January 29, 1999, Plaintiff was sentenced by Judge CACHERIS.

On June 30, 1999, the Fourth Circuit Court ordered TRIMPER to file Plaintiff's (Pro-Se) criminal appeal, dismissing Plaintiff's Pro-Se appeal, on the Court's appointed counsel, TRIMPER filing the appeal. (Pltf's Exh. C-1).

On or about April 2000, Plaintiff learned from paid attorney, John DIJOSEPH that there is a voice-tape that would show and prove Plaintiff is innocent, where CACHERIS' court reporter, Don McCoy, has the tape, but would not release a copy to Plaintiff or DIJOSEPH without CACHERIS' Order. (Pltf's Exh. C-5)

Accordingly, on all Plaintiff's facts, evidence, exhibits and THIRD-PARTY documents, all contradict, dispute, are adverse to and challenge anything the Government's Motion to Dismiss and claims of immunity do not address, exposes to this Court that the Government is a direct

12

party to and is a primary result of all Plaintiff's causes of action stated and outlined in the

Complaint. Therefore, for these reasons, Plaintiff's complaint states a cause of action from

which all relief can be obtained, contrary to Fed. R. Civ. P., Rule 12(b)(6).

## SUPREME COURT GIVES PRIVATE RIGHTS OF ACTION IN 4TH AMENDMENT AND DUE PROCESS CLAUSES A § 1983 REMEDY

The Government's Motion to Dismiss Plaintiff's Complaint must fail because the

Government has purposely not disclosed to this Court about its being repeatedly told about the

unconstitutional and civil rights violations of its two rogue agents, WANAT and DAVIES. After

being told by Plaintiff beginning on and after June 6, 1998, the Government has repeatedly failed

to take any corrective action, correcting the harm and damages done to Plaintiff, where there is

facts and evidence that Plaintiff's Fourth Amendment rights were violated during a wrongfully

committed IRS raid of Plaintiff's home. In the Supreme Court's ruling in <u>Bivens</u>, (citations

omitted), and its progeny, the Supreme Court held that a Plaintiff has a Fourth Amendment, §

1983 cause of action against the Government, irrespective of any immunity protecting the

'Government' agents.

> In <u>Correctional Services Corp. v. Malesko</u>, 534 U.S. 61 (2001), "Our authority to
> imply a new constitutional tort, not expressly authorized by statute, is anchored in
> our general jurisdiction to decide all cases "arising under the Constitution, laws, or
> treaties of the United States." 28 U.S. C. § 1331." "We first exercised this
> authority in *Bivens*, where we held that a victim of a Fourth Amendment violation
> by federal officers may bring suit for money damages against those officers in
> federal court. . ."the Fourth Amendment does not in so many words provide for
> its enforcement by award of money damages for the consequences of its
> violation."

> In <u>Bivens</u>, 403 U.S., at 396. "Nonetheless, relying largely on earlier decisions
> implying private damages action into federal statutes, see *id.*, at 397 (citing <u>J.I.</u>
> <u>Case Co., v. Borak</u>, 377 U.S. 426, 433 (1964)); 403 U.S., at 402-403, n. 4
> (Harlan, J., concurring in judgment); ("The <u>Borak</u> case is especially a clear
> example of the exercise of federal judiciary power to accord damages as an
> appropriate remedy in the absence of any express statutory authorization of a
> federal cause of action"), and finding "no special factors counseling hesitation in
> the absence of affirmative action by Congress," *id.*, 395-396, "[w]e found an
> implied damages remedy available under the Fourth Amendment." . . .We
> reasoned that the threat of suit against the United States was insufficient to deter

13

the unconstitutional acts of individuals. *Id.*, 21 ("Because the *Bivens* remedy is recoverable against individuals, it is a more effective deterrent than the FTCA remedy"). <u>446 U.S., at 19-20</u>.

## HECK V. HUMPHREY DOES NOT APPLY IN THIS CASE

"Section 1983 provides, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any person within the jurisdiction thereof to (be) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The Government raises the Supreme Court's case, <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994) as a bar against Plaintiff's § 1983 complaint stating the Supreme Court case blocks and prevents in <u>Heck</u>, Plaintiff's § 1983 from moving forward because it will "expose misconduct committed by the Government's agents, Assistant U.S. Attorney(s), District Court Judge, and the court-appointed defense attorney, who all jointly or separately, within their own collaborated acts, did purposely violate and knowingly abuse their positions and duties,

That case does not apply in this case because Plaintiff has –repeatedly been denied ever getting any 'fair hearings', 'impartial judicial reviews' and 'never given effective assistance of counsel' that the Constitution demands of any 'accused "criminal" defendant', where the Government's own agents, i.e., a specific District Judge continued to prevent Plaintiff from ever being constitutionally heard in a full-fair hearing, before either an impartial judge and/or jury; The Government's own attorney(s) have continued to block, hinder and prevent Plaintiff from ever getting, under the Supreme Court's prior ruling, *In re.,* <u>Strickland</u>, (citations omitted), any effective assistance of court-appointed (defense) counsel; and, the Government has also unconstitutionally denied Plaintiff any –court-appointed– appellate counsel, that Plaintiff is constitutionally entitled to.

14

Recently, the Supreme Court ruled in <u>United States v. Gonzalez-Lopez</u>, (546 U.S. ____

(June 26, 2006), rendering this case's federal claims subject to (new) review where the

Government's own AUSA and Judge played a direct and indirect part in the denial of Plaintiff's

Sixth and Fourteenth Amendments rights, also subject to § 1983.

The Government misrepresented the application of <u>Heck's</u> ruling when using it to block,

prevent and hinder Plaintiff's §1983 civil rights complaint against Government actors who did

intentionally cause Plaintiff's constitutional rights to be violated.  The Government is relying on

that holding, contradictory to other holdings and rulings made by the Supreme Court, that is

violating a (wrongfully convicted defendant's) § 1983 claim(s) where the Government did cause

all resulting injuries to a Plaintiff, forcing a § 1983 Plaintiff to prove that his conviction or

sentence has been reversed on direct appeal; expunged by executive order, . . ."

The Supreme Court erred by failing to address in <u>Heck</u> that if a District Court and Court

of Appeals unconstitutionally failed or refused to provide or grant a prospective § 1983 Plaintiff

any fair hearing(s) and effective assistance of (court-appointed) defense counsel and 'appellate

counsel', that would render the Supreme Court's ruling in <u>Heck</u> unconstitutional in that it

condones the wrongful denials of a 'defendant's' guaranteed by the Constitution's Bill Rights, in

the Fourteenth Amendment and Due Process Clauses is vacant and an empty application of our

laws.   Additionally, the Supreme Court would be condoning the same unconstitutional acts not

granted to every citizen, "the presumption of innocence", under the Constitution's Bill of Rights

and Due Process Clause would be ignored is a serious error of <u>Heck's</u> ruling.  That holding

prevents an uncorrupt court and judge from hearing a meritable case on review, and looking

behind a Pro-Se Plaintiff's facts and evidence which shows an unconstitutionally convicted

'defendant' is blocked from addressing to a Court, before an uncorrupt District Judge

all constitutional and civil rights entitled to be heard in a § 1983 claim.

15

Adverse to what the Supreme Court held in Heck, the Court addressed in Saucier v. Katz, 533 U.S., at 206, (For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful),  see Mitchell v. Forsyth, 472 U.S. 511, 535, n. 12;  but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635 (1987)).  "Section 242 makes it a crime for a state official to act "willfully" and under color of law to deprive a person of rights protected by the Constitution."

The Court's ruling in Heck fails to address that point when a Government's agent, albeit a Judge or AUSA who is engaged in a criminal conspiracy with others to get what amounts to a false conviction using what the Supreme Court has said is the unconstitutional use of perjured testimony and altered or manufactured evidence.  Heck prevents a legitimate § 1983 Plaintiff wrongfully convicted and unconstitutionally denied by a district judge from exposing 'corruption' that exists in that district court's denials, pointing to that specific judge, from which if Heck were to continue to be the case here, condones all those violations of the Due Process, Bill of Rights and Constitution's protections, granted after Heck's ruling, that is now overruled by other dicta and holdings on prosecutorial and judicial misconduct occurring in grand juries and during trials. The Supreme Court has erred in its holding, allowing ongoing corruption within our judicial system that is illustrated by a denial of Plaintiff's § 1983 complaint which is making a clear showing of the ongoing wrongful and illegal conduct referenced in Saucier v. Katz, 533 U.S., at 206, and other more recent Supreme Court rulings and holdings.

The Supreme Court held in Heck that a § 1983 Plaintiff is not allowed to expose any wrongful and unconstitutional convictions, (thus invalidating that conviction) from which perjury, manufactured evidence, altered documents were used to obtain an involuntary, uses of force, threats and coercion to obtain that Rule 11 violation against a semi-drugged defendant that is rendering any plea, involuntary, unknowing, and unintelligently entered through a § 1983 civil action which does raise all elements of that same illegal activities and judicial or prosecutorial

16

misconduct committed by Government officers, agents, prosecutors and judges, not ever

properly addressed in any District Court habeas under § 2254 or § 2255 in Alexandria District.

The Court did not address in its ruling any alternative(s) to those who are wrongfully

convicted by a 'corrupt' lower district court judge and/or unlawful or unconstitutional acts

committed by a 'defendant's' court-appointed criminal attorney, who was purposely ineffective,

deficient or defective in his/her representation of the(ir) client, a defendant. In the Supreme

Court's rulings after Heck, those rulings cast serious doubt on the holding in <u>Heck</u>, where the

Court has held in cases of Government (agents-officers') misconduct, prosecutorial and judicial

misconduct that involves a prosecutor's knowingly using perjured, altered or manufactured

evidence for an indictment, or in a trial; and where the judge in the case is shown by a

'defendant' to be partial, bias and show favoritism against a fair hearing or trial, renders where

the Government's own agents, judges and prosecutors abuse their position, duties and

responsibilities renders the ruling of <u>Heck</u> unconstitutional and condoning the blocking,

preventing and hindering of a Plaintiff's (defendant's wrongful denial) of any habeas relief under

either § 2254 or § 2255.

(Souter, J., criticizes our reliance on malicious prosecution's favorable termination

requirement as illustrative of the common law principle barring Plaintiff's from mounting collateral

attacks on their outstanding criminal convictions." . . ."We attempted to "reconcile the apparent

contradiction in the authorities," *id.*, at 151, by observing that the presumption of probable cause

arises from a conviction can be rebutted only by showing that the conviction was (had) been

obtained by some type of fraud, *Ibid*.")

In today's society, more and more facts about our 'corrupt' judicial system and the facts

as exposed from the inside of a grand jury, (as in this case), and as illustrated in Plaintiff's facts

and evidence, that an estimated tens of thousands of persons in the Federal and State judicial

17

system are actually innocent, but were involved because of a (Government) witnesses' retaliating and malice that was deliberately overlooked by a District Attorney, in the State system; or AUSA in the Federal system, as in this case. It is for these factual reasons that the Government's deliberately intentional, and nothing less than criminal acts that involve 'criminal conspiracy', obstruction of justice by the AUSA and District Court Judge, who then engage in a conspiracy with the Judge's court-appointed defense attorney renders this case's § 1983 complaint a matter of exposing the ongoing unconstitutional conduct as committed by the Government's (District Judge) who has continued to abuse his powers, duties, and position, while purposely withholding exculpatory facts hearing (voice) tapes and other relevant and material evidence under Brady v. Maryland, (citations omitted).

A suit for damages attributable to an unreasonable search may lie in § 1983, under Bivens, even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 Plaintiff's (defendant's) still outstanding conviction. . . .In order to recover compensatory damages, however, the 1983 Plaintiff must prove, not only that the search was unconstitutional and illegal when conducted by a Government agent, but that it caused him actual, compensable injury, which we hold today, does not encompass that the "injury" of being wrongfully convicted and imprisoned review able by a court. Tower v. Glover, 467 U.S. 914, 923 (1984).

### PLAINTIFF'S DENIAL OF GOVERNMENT'S DEFENSES ALLEGING SOVEREIGN AND QUALIFIED IMMUNITIES.

In 1992, IRS agent WANAT was previously involved in the unlawful termination of FIORANI. The unlawful termination was reversed by the Merit Systems Protection Board, (MSPB). Agent WANAT used the reversal of Fiorani's employment termination to fabricate ¶ 10 in the entry in (his) search warrant against Fiorani. That paragraph would be proven false by IRS

18

personnel when revealed to IRS Commissioner Rossotti and others in the DOJ and IRS, in Plaintiff's and Gardiner's letters to IRS and DOJ.  (Pltf's Exhs. C-4).

The IRS, an agency of the Government failed or refused to act against anyone to Plaintiff's prior and current attorney's information.  Nor did the Government take any specific (criminal action) against IRS agent WANAT, DAVIES, MINARD and GONZALEZ since then, defense counsel was unable to learn after September 1999 to this date.  That failure raises a question on if the agency condoned WANAT's and DAVIES' unlawful, criminal actions committed in the grand jury and where there was not any probable cause from which to obtain any search warrants on the disclosed –telephone threats-- made to FIORANI's home on January 10, 1998.  Mr. GARDINER showed the letter and notes from that telephone call to (then) AUSA Robert CHESTNUT, who refused to prosecute Plaintiff on those illegal actions committed by MINARD, GONZALEZ and IRS-TIGTA agents WANAT and DAVIES.

## DEFENDANT TRIMPER'S UNCONSTITUTIONAL ACTS AND INEFFECTIVE ASSISTANCE OF COUNSEL UNDER COLOR OF LAW

The Supreme Court has held under the Strickland standard that a -court-appointed attorney is ineffective if that attorney's performance(s) falls below a standard where that attorney causes prejudice to his client, the defendant in a criminal action.  Under the prevailing Circuits, listed below, TRIMPER was deliberately ineffective, defective and intentionally deficient in performing under the High Court' standard.

Moreover, when a court appointed attorney acts in concert with another under color of law, that attorney is liable to the injured (defendant, client) for all damages caused by that court-appointed attorney.  Plaintiff's complaint includes Glen TRIMPER as a defendant where TRIMPER did not effectively perform as Plaintiff's –court-appointed-defense counsel– under the Supreme Court's many rulings in Strickland, Avila,(9th Cir.), Rubin, (4th Cir.), Jenkins, (2nd Cir.), Castellano, (5th Cir.) and Dickerson, Mickens and Williams and their progeny, as held by the

19

Supreme Court.  Defendant TRIMPER also acted *under color of law*, as an agent for the

Government, as held by the Supreme Court in Tower v. Glover, 467 U.S. 914, (1984). (1.

Respondent's complaint adequately alleged conduct "under color of " state law for purposes of §

1983, in view of the conspiracy allegations.  Although appointed counsel in a state criminal

prosecution does not act "under color of" []law in the normal course of conducting the defense,

an otherwise private person acts "under color of law" when he engages in a conspiracy with a

state official to deprive another of his federal rights." Dennis v. Sparks, 449 U.S. 24, Pp. 919-

920.  ". . .2. State public defenders are not immune from liability under § 1983 for intentional

misconduct by virtue of alleged conspiratorial actions with state officials that deprives their

clients of federal rights."

Plaintiff further states that in direct conjunction with District Judge CACHERIS, who

condoned, allowed and permitted defendant TRIMPER to be court-appointed, there should be,

under these facts and Plaintiff's exhibits, or collections of evidence, that would allow the

Government's immunities to be condoned by Congress where Plaintiff has made a showing of

both cause(s) and "prejudices" from which this Court must deny the Government's defense(s) of

immunities for HACKNEY, IRS agents WANAT and DAVIES, and district court appointed

defense counsel, TRIMPER under these Supreme Court case(s).

Plaintiff was unable to obtain effective appointed defense counsel because of the on-

going criminal conspiracy between AUSA HACKNEY and District Judge CACHERIS, who

repeatedly abused his position as judge, thereby knowingly violating Plaintiff's Due Process and

Fourth, Fifth, Sixth and Fourteenth Amendments claims, had TRIMPER not acted defectively,

ineffectively and as held in Groh v. Ramirez, 540 U.S.551 (2004) and under Strickland (citations

omitted), Mickens, (citations omitted), Dickerson, (citations omitted), Penson, (citation omitted),

and Williams, (citations omitted).  The Government's agent, District Judge CACHERIS has

abused his position as a neutral judge, showing extreme prejudices to Plaintiff by unconstitutionally denying all his legitimate requests to the Court, requesting all exculpatory evidence and voice tapes that would prove TRIMPER and HACKNEY were engaged in a criminal conspiracy that forced threatened and coerced Plaintiff to plead guilty to crimes that never occurred. "By contrast, decisions . . . "'beyond the power of the criminal lawmaking authority to prescribe," id., at 311. (quoting Mackey, supra, at 692), necessarily carry a significant risk that a defendant stands convicted of, "an act that the law does not make criminal." Davis v. United States, 417 333, 346 (1974). "He is not arguing [] his guilty plea was not intelligent, but rather that it was not intelligently made because the information provided him by the District Judge at his plea colloquy was erroneous." This type of claim can be fully and completely addressed on direct review based on the record created at the plea colloquy. . . "cause" and actual "prejudice", Murray v. Carrier, 477 U.S. 478, 485 (1986); Wainwright v. Sykes, 433 U.S. 72, 87 (1977), (. . .or that the defendant is "actually innocent."); Murray, supra., at 496; Smith v. Murray, 471 U.S. 527, 537 (1986), See Bousley, at Pp. 622-623.

Various circuit courts have ruled adverse under ineffective assistance of [court] appointed, defense counsel in Avila v. Galaza, 297 F.3d 911 (9th Cir 2002); Rubin v. Gees, 292 F.3d 396 (4th Cir. 2002); and Jenkins v. Artuz, 294 F.3d 284 (2nd Cir. 2002).

TRIMPER acted as an agent for the Government, under [the] color of law, when he was hired by the Court and paid by the Government, failing repeatedly to comply to the client's requests, demands and failed to defend the client against the Government's allegations. Too, TRIMPER repeatedly refused to challenge the corruption of HACKNEY'S uses of perjury, false statements, and manufactured evidence or altered documents, (Pltf's. Exh. N-4) from which the unconstitutional indictment arose? TRIMPER failed repeatedly to expose an ongoing 'corrupt-ion' of District Judge's actions where HACKNEY and CACHERIS knew about the perjury in the grand (per interviews with three grand jurors).

Factually from the very beginning, TRIMPER failed to challenge any of the corrupt Judge CACHERIS' rulings denying Plaintiff all Brady exculpatory evidence, facts and (voice) tapes that would prove Plaintiff innocent under Brady v. Maryland, 373 U.S. 83, 87, (1963), United States v.