CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| IN THE MATTER OF THE | ) | |
| SEARCH AND SEIZURE WARRANTS | ) | Nos. 98-44-MG |
| 7115 LATOUR COURT, | ) | 98-45-MG |
| ALEXANDRIA, VA, ET AL. | ) | 98-46-MG |

## MOTION TO SUPPRESS AND DISMISS

COMES NOW Rosario Anthony Fiorani, Jr., by counsel, and moves this court, pursuant to Rule 41(e), Fed. R. Crim. Pro., to order the suppression of all property seized pursuant to the above-listed warrants, under the Fourth and Fifth Amendments of the United States Constitution.

On February 5, 1998, Inspector Kevin M. Davies swore to and in an affidavit for warrants to search: 1) 7115 Latour Court, Alexandria, VA; 2) a grey Toyota registered to Mr. Fiorani; and 3) Mr. Fiorani's person. The affidavit alleged that Mr. Fiorani had violated 18 U.S.C. §912 in July, 1997, in August, 1997, and on December 20, 1997. For the reasons that follow, the statements in that affidavit are not true, and have been found to be false statements, relied upon by IRS agent Davies, and do not establish probable cause to believe that all of the evidence obtained from the unlawful and unconstitutional search does not amount to any offense(s) found at the location, in the car, or on the person of Mr. Fiorani.



I.
## The Affidavit Does Not Demonstrate That The
### Items To Be Seized Were At The Places To Be Searched

The Fourth Amendment dictates that, before a search warrant may be issued, probable cause must exist to believe that a legitimate object of a search would be found at a particular place. See Steagald v. United States, 101 S. Ct. 1642, 1648 (1981). As stated in United States v. Lalor, 996 F.2d 1578 (4th Cir. 1993):

> In determining whether a search warrant is supportive by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized would be found in the places to be searched.

Id. at 1582.

The affidavit sets forth (on page 7) five categories of items to be seized:

A.  Any credentials or other form of government identification, whether such documents are real of falsified, and tools used to manufacture such credentials, or documents reflecting their manufacture.

B.  Any documents relating to efforts to receive vehicles from any car dealership including but not limited to Crystal Ford or Ted Britt Ford, or complaints about such dealerships, including but not limited to letters or telefaxes.

C.  Any documents which contains allegations that FIORANI was a government employee or law enforcement official after October, 1992.

D.  Any computer or computer storage disks in any form which might contain the above documents. . . .

E.  Telefax machine.

Nothing in the affidavit provides probable cause to believe that any of these items were to be found in the three places to be

searched.

A.    Credentials: The only two references in the affidavit to credentials are the August and December meetings.  As to the August meeting, the affidavit asserts that Mr. Fiorani "displayed some kind of credentials with a badge . . . ."  Affidavit ("Aff.") 3.  As to the December meeting, the affidavit asserts that Mr. Fiorani "showed Minard credentials and a gold and blue badge."  Aff. 4.  There is no allegations that these credentials and badges were a "form of government identification . . . ."  Aff. 7.  Thus, there was no probable cause to believe that "credentials or other form of government identification would be found in Mr. Fiorani's possession.

In addition, there is no reference whatsoever to Mr. Fiorani having manufactured "credentials or other form of government identification."  Thus, there is no probable cause to believe that "tools used to manufacture such credentials, or documents reflecting their manufacture" would be found in his possession.

B. Documents relating to efforts to receive vehicles: The only reference to documents relate to the July and December meetings.  As to the July meeting, the affidavit states that "Gonzalez stated that he later received several faxes from FIORANI . . . ."  Aff. 2.  There is no assertion that these faxes were sent from any of the places to be searched.[1]  As to the December meeting, the affidavit

---

[1].  The faxes certainly were not sent from Mr. Fiorani's car or his person.

states that "FIORANI faxed several letters to Crystal Ford. . . . The faxes are imprinted at the top with data showing that they were faxed from a Northern Virginia phone number." Aff. 4.  There is no information that connects the "Northern Virginia phone number" to any of the places to be searched, particularly not Mr. Fiorani's car or on his person. Thus, there is no probable cause to believe that any documents would be found at any of those places (searched).

C.  Documents containing allegations that FIORANI was a government employee after October, 1992: As there are no references in the affidavit to the existence of any such documents, there is no probable cause to believe that they would be found at any of the places to be searched.

D.  Computer/computer storage disks which might contain above documents: As explained above, there is no probable cause to believe that any of the documents mentioned in B or C would be found at any (of) the places to be searched; thus, there is no probable cause to believe that any of such documents would be found in a computer or in (any) computer storage disks.  Indeed, the affidavit itself states only that a computer or in computer storage disks "might" contain the above documents.

Moreover, there is nothing in the affidavit which even hints that there was a computer or computer storage disks at any of the places to be searched; thus, even apart from the absence of probable cause to believe that the documents were at any the places

-4-

to be searched, there was (is) no probable cause to believe that there was a computer or in computer storage disks at any the places to be searched.

E.    Telefax machine: The only reference in the affidavit to faxes relate to the July and December meetings.  As to the July meeting, the affidavit states that "Gonzalez stated that he later received several faxes from FIORANI . . . ."  Aff. 2.  There is no assertion that these faxes were sent from a telefax machine at any of the places to be searched.  As to the December meeting, the affidavit states that "FIORANI faxed several letters to Crystal Ford . . . . The faxes are imprinted at the top with data showing that they were faxed from a Northern Virginia phone number." Aff.4. There is no information that connects the "Northern Virginia phone number" to any of the places to be searched. Thus, there is no probable cause to believe that there was a telefax machine at any of those places.

## II.
### The Information In The Affidavit Was Stale

The alleged violations occurred in July, 1997, in August, 1997, and on December 20, 1997. The affidavit was sworn out on February 5, 1998, some 7 months after the first alleged violation, 6 months after the second alleged violation, and almost 7 weeks after the third alleged violation.

In United States v. McCall, 740 F.2d 1331 (4th Cir. 1984), the court discussed at length the concept of staleness:

We must first consider the staleness argument. The Fourth Amendment bars search warrants issued on less than probable cause, and there is no question that time is a crucial element of probable cause. A valid search warrant may issue only upon allegations of "facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether proof meets this test must be determined by the circumstances of each case." Sgro v. United States, 287 U.S. 206, 210-211, 53 S.Ct. 138, 140-41, 77 L.Ed 260 (1932). See also, e.g., United States v. Watson, 423, U.S. 11, 449 n.14, 96 S.Ct. 820, 840 n. 14, 46 L.Ed. 2d. 598 (1976) (Marshall, J., dissenting); United States v. Freeman, 685 F2d 942, 951-52 (5th Cir.1982); United States v. Beltempo, 675 F.2d 472, 476-79 (2d Cir.), cert. denied, 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982); United States v. Button, 653 F.2d 319, 324-25 (8th Cir. 1981). Consequently, evidence seized pursuant to a warrant supported by "stale" probable cause is not admissible in a criminal trial to establish the defendant's guilt.

Cases in which staleness becomes an issue arise in two difference contexts. First, the facts alleged in the warrant may have been sufficient to establish probable when the warrant was issued, but the government delay in executing the warrant possibly tainted the search. See, e.g., United States v. Lemmons, 527 F.2d 662 (6th Cir. 1975) (Five day delay), cert. denied, 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976). Second, the warrant itself may be suspect because the information on which it rested was arguably too old to furnish "present" probable cause. See, e.g., United States v. Minis, 666 F.2d 134 (5th Cir.), cert. denied, 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982); United States v. Dennis, 625 F.2d 782 (8th Cir. 1980); United States v. Rosenbarger, 536 F.2d 715 (6th Cir. 1976), cert. denied, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977). A reviewing court's task in each category is slightly different. In testing a warrant in the first category, it must decide whether a valid warrant became invalid due to the lapse of time; when considering those in the second category, it must determine whether information sufficient to constitute probable cause was ever presented. The court's fundamental concern, however, is always the same; did the facts alleged in the warrant furnish probable cause to believe, at the time the search was actually conducted, that the evidence of criminal activity was located at the premises searched?

-6-

740 F.2d at 1335-1336.

In the case at bar, the facts alleged in the affidavit do not "furnish probable cause to believe, at the time the search was actually conducted, that evidence of criminal activity was located at the premises searched" since there is nothing in the affidavit to suggest that any of the items sought to be seized were likely still to be in the places to be searched.

Even as to the December meeting, which occurred almost 7 weeks before the affidavit was sworn (out), there is nothing in the affidavit which would suggest that the credentials or the documents to be seized (the only items which could have been on Mr. Fiorani's person) were still on his person, that the credentials (the only items to be seized which the affidavit mentions as being in the vehicle) were still in the vehicle, or that any of the items to be seized were still in his home.

### III.
### The Information In The Affidavit
### Does Not Allege Violations of §912

§912 provides:

> Whoever falsely assumes or pretends to be an officer or employee acting under authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both.

In United States v. York, 202 F. Supp. 275 (E.D. Va. 1962), the court emphasized that, under §912, pretending to be an employee of the United States is not sufficient; the defendant must pretend

-7-

to be an employee of the United States "acting under authority of the United States . . . ." thus, in the context of purchasing property, for there to be an offense, the defendant must be pretending to buy the property for the United States or to be authorized by the United States to buy the property. 202 F. Supp. at 277.

Subsequently, in United States v. Parker, 699 F.2d 177 (4th Cir. 1983), the Court of Appeals held:

> Parker first represented that he was an agent of the Internal Revenue Service. That statement alone would not be enough to violate the "acts as such" element of the crime of personation. . . . But he then asserted he was investigating a report that Brooks was not paying taxes on the sale of firewood. This went beyond nonculpable false pretense.

699 F.2d at 179.

In the affidavit in the instant case, there is no assertion, as to the July, 1997 meeting, that Mr. Fiorani informed anyone that the car was for the United States, that he was authorized by the United States to buy the car, or that he was even acting in an official capacity. Indeed, the affidavit states that Mr. Fiorani "stated that he planned on outfitting the car with emergency response lights and communications." Aff. 2.

As to the August, 1997 meeting, there are no allegations that Mr. Fiorani did any more than, according to Mr. Gonzalez, than to portray himself as a federal employee. Under Parker, this is plainly insufficient to make out a violation of §912.

-8-

Therefore, this Court should suppress all evidence obtained in the search of Mr. Fiorani's home, car and person, and return all such documents and property seized pursuant to the three warrants back to Mr. Fiorani, forthwith.

## DEFENDANT'S MOTION TO DISMISS

Mr. Fiorani disputes and rebuts the allegations and charges as stated in both the affidavit and in the indictment on these grounds and for these reasons as there is no basis or credible evidence to support the charges as alleged.

1. The agent in serving the affidavit to search and seize Mr. Fiorani's property failed to secure that the statements made in the affidavit were truthful, as stated by Mr. Minard and Mr. Gonzalez.

In researching the statements made by both witnesses, Minard, Gonzalez and Agent Davies, the defendant first goes to the statement(s) made by agent Davies, himself, who swore to the information stated in paragraph #10. In the affidavit, (#10), it states, [that] FIORANI was hired . . . and terminated on October 5, 1992 for falsifying employment application forms." Additionally, one of the agents who had first had knowledge of the falsity of the statement was the same agent who assisted Agent Davies in conducting and coordinating the search and seizure of Mr. Fiorani's home, car and person, Mr. John Wanat.

That statement is false and on the basis of its inaccuracy, there is no basis for any probable cause for issuing the search

warrants. Mr. Fiorani resigned on December 4, 1992. Thus, that information was known by the Internal Revenue Service, IRS, for six years to be false, prior to Agent Davies' falsely sworn statement in his affidavit in support of probable cause to search Mr. Fiorani's home, car and person.

Next, we go to statements made by Mr. Steven Gonzalez. Each of those statements should have been questioned, through verification, before Agent Davies swore out the affidavit for three search warrant based on alleged probable cause to have a judge issue such search and seizure warrants.

2. In Affidavit Nos. 3 and 4., Mr. Gonzalez made statements to Agent Davies. His first statement is, "FIORANI portrayed himself as a United States Treasury Agent . . ." Nowhere is there any substantial evidence from Mr. Gonzalez that Mr. Fiorani did that. Too, the affidavit makes reference that Mr. Fiorani [was] looking for a police package Ford Crown Victoria. There are no laws, where a private person is prohibited from making a "private or personal purchase" of such a vehicle. Thus, there is no probable cause so far which would legitimately make out any probable cause under §912, as stated in the affidavit.

Indeed, Mr. Fiorani was seeking to make a personal purchase of an "alleged" police car. But, there is no other evidence from Mr. Gonzalez that makes that a crime under any present law. The next statement is, "Gonzalez was not sure of the division of the United States Treasury Department FIORANI was with . . ."

-10-

Realistically, Gonzalez's statement should have been highly suspect by Agent Davies, because Agent Davies' own affidavit, (Aff. .4 Pg. 4), makes reference at the top, "[t]he credit report makes reference that he was _formerly_ employed by the United States Treasury." This information does not sufficiently make out any probable cause from which a warrant can be legitimately issued.

3. Mr. Gonzalez next falsely stated to Agent Davies, "FIORANI stated [that] he planned on outfitting the car with emergency response lights and communications." There is no evidence which supports anything even remotely close to Gonzalez's telling the truth in his statement to Agent Davies. Mr. Fiorani had a car phone and Gonzalez knew it. Gonzalez had knowledge that Mr. Fiorani was intending to transfer his cellphone over to the new car. However, to form a basis of getting even with Mr. Fiorani for the consumer complaint, Gonzalez fabricated more and elaborated more for the agent's sake.

Those statements, if true, still do not form any foundation for probable cause, in support of such issuance of the three search and seizure warrants, since there is no laws which prohibit transferring a cellphone from one car to another.

4. The next statement that Gonzalez made, which was found to be false and knowledgeably so, which too, Agent Davies should have checked out Gonzalez's statement, "FIORANI asked for the General Services Administration (GSA) price for the 1998 Ford Crown Victoria." That statement is false because, according to Ford

-11-

Motor Corporation, there is no GSA price. Gonzalez, as a salesman knew it was false when he said it to Agent Davies; and, Agent Davies should have checked it out prior to swearing out a search warrant on the basis of Gonzalez's statements.

Moreover, there is no evidence that Fiorani ever knew that there was a "special-GSA price"; and, Agent Davies should have realized that 1998s were not made yet in July 1997. Too, why would Mr. Fiorani be seeking a 1998 while ordering a 1997 with a GSA price? These statements of Gonzalez's are not realistic or logical and do not form the grounds for a search warrant.

5.    The next false statement Agent Davies relied upon to secure a search warrant, which Agent Davies should have also check out or verified, under Franks v. Delaware and U.S. v. Leon, was: "Gonzalez advised FIORANI if he wanted to get the more favorable United States Government rate he needed to provide the dealership with a *Federal Identification Number*, (FIN)." This statement is false since, according to Ford Motor Company, there is NO SUCH NUMBER. According to Ford, an (FIN) number stands for –Fleet Identification Number–. (Aff. 3., pg. 2) It is used by Ford to provide *anyone*, business, government or any private persons who purchase three or more cars at one time; or, who have purchased more than 15 cars in five years, will be provided a discount on each car purchased. Ford stated to Defendant's attorney and to Defendant in a telephone call, that Gonzalez's statement(s) are

-12-

false. Too, Ford stated [that] all Ford salesmen are trained on this point, and all dealerships are knowledgeable of these facts.

It was inferred from Ford, that Gonzalez knowingly lied to Agent Davies when he made those statements that Agent Davies relied on for those search warrants. There is no basis of the search warrants, which indicate the warrants violated Mr. Fiorani's Fourth Amendment Constitutional Rights, under <u>Bivens</u> and <u>Albright</u>, and does not provide any probable cause for an issuance of such search and seizure warrants by a magistrate judge, based on the alleged facts put forth in the Affidavit.

6. The next statement Gonzalez provided Agent Davies and was found to be knowingly false, material, with the other five statements, included violated the Federal statute, 18 U.S.C. §1001, was: "FIORANI was given a price on the car that was significantly lower than what would be given to a non-government customer." That statement, in conjunction with Gonzalez's other statement should be suspect, in combination with sentence #5, (Aff. 3.), Gonzalez stated, "<u>Gonzalez advised FIORANI</u> . . ." That statement should be suspect, because it does not say that Mr. Fiorani asked for it.

Thus, when Gonzalez made reference to a fax, he knew that Mr. Fiorani had placed a call to Ford; spoke to Diane at Ford; and, that fax was coming back to Gonzalez, verifying what Diane advised Mr. Fiorani, —"[t]hat Mr. Fiorani did not qualify for any discounts. The application sent to Mr. Fiorani from the Fairfax County Consumer Affairs Office, shows Mr. Fiorani purchased it, or

-13-

attempted to purchase it in his own name.  There is no mention or any inference that Mr. Fiorani was attempting to purchase a "police car package" for a GOVERNMENT, nonetheless for a[ny] United States Government Agency, as alleged by Gonzalez, Minard and Agent Davies, as stated in the Affidavit and Indictment.

Wherein, there is no probable cause for the issuance of any search and seizure warrants against Mr. Fiorani, based on the allegations in the Affidavit.

7.   The next statement that defense found was false and Gonzalez knew was false consisted of (Aff. 3. pg. 2.), when Gonzalez stated, "[h]e later received several faxes from FIORANI detailing the required GSA specifications for the "police package."

That statement is false because, logically, how would Mr. Fiorani have any knowledge of what the GSA package was, consisted of, or where would he be able to obtain that information, except from Mr. Gonzalez, who either walked him through their car lot, which contains those cars.  Remember, Gonzalez's other statements were also inconsistent and were known by Gonzalez to be false statements when he made them to Agent Davies.

Indeed, there is no evidence which provides for a search warrant to be issued, in light that Agent Davies should have verified Gonzalez's statements before running off to Judge Buchanan to have issued three such search and seizure warrants to search. The Affidavit forms a foundation of a direct violation of Mr. Fiorani's Constitutional Rights pursuant to the Fourth Amendment,

-14-

and is a form of an illegal search under the Constitution.

8.    The next statement Gonzalez made to Agent Davies and appears in the Affidavit, (Aff. 4. pg. 2), states, "FIORANI called the dealership later in the day and started giving Gonzalez numbers that were off "his secretary's desk." That statement is insufficient on its face to seek the issuance of a warrant on. It falls far short and does not provide any basis for probable cause to issue a warrant on. It is also false.  Had Agent Davies verified it, Mr. Fiorani does not have a secretary who has a desk from which information can be dispensed from.

Additionally, if sentences 2 through 7 are false, then logically and reasonably sentence 8 is also false and does not hold probable cause for the issuance of a search warrant.

9.    The next statement made by Gonzalez to Agent Davies is "FIORANI gave several different strings of numbers but was unable to come up with the correct string." This also fails on the basis that Gonzalez's statement relating to the FIN$^{IS}$ knowingly and materially false. (Aff. 4., pg. 2.).  It relates back to several other "false statements" made by Gonzalez to Agent Davies.

10.   The next statement Gonzalez made to Agent Davies is, "Gonzalez did not provide FIORANI with this information." However, if Agent Davies were to have properly verified the information, Agent Davies would have come up with a fax to Gonzalez, which would have proven that Gonzalez's statement was knowingly false, because the date on the fax to Gonzalez was from Diane, Ford Motor Company.

-15-

11. Gonzalez's next statement to Agent Davies is, "[t]he dealership declined to release the vehicle to FIORANI, since he could not come up with the proper identification number." (Aff. 4.) That statement is false and does not provide any probable cause. Gonzalez knew it was false, or should have known it was false since [he] placed the purchase paperwork through to his superiors for Mr. Fiorani's credit, which was rejected by Ted Britt Ford. This was presented to Mr. Fiorani by letter from Ford Motor Credit Corporation, dated on or about November 1997.

—Not because he could not come up with some form of "identification number."— Gonzalez's statements to Agent Davies, who relied on those "false" statements, under §1001, made to him by Mr. Gonzalez, found in the Affidavit are totally without merit and so baseless on probable cause that all products of the search and seizure should be excluded.

12. The final statement made by Gonzalez to Agent Davies was, "Ultimately, the dealership declined to release the vehicle to FIORANI, since he could not come up with the proper identification number." That statement is false. It rests on the other previously made statements that Gonzalez knew, and had reason to know were false before he made them to Agent Davies.

This final statement rests on the false FIN statement that was proven false by Ford Motor Company, and the credit decline from both Ford Motor Company and the Ford Credit Corporation. Those facts were not stated to Agent Davies prior to his running to the

-16-

United States Magistrate Judge for issuance of three search and seizure warrants against Mr. Fiorani.

Likewise, Gonzalez knew they were false, since he was the person who told Mr. Fiorani that the bank, through Ted Britt Ford's invasion into Mr. Fiorani's credit report, rejected Mr. Fiorani for the car's purchase, including Ford Motor Credit Corporation's letter to Mr. Fiorani.

Subsequently, the defense found out that Gonzalez fled the State of Virginia to avoid possible prosecution and is possibly living in the State of Florida. Too, the defense has obtained information that Gonzalez and Minard of Crystal Ford, may have conspired to commit perjury, or in the alternative, deliberately falsified numerous statements to Agent Davies in an effort of deliberately and maliciously causing Mr. Fiorani serious harm, injury and damages to his person, reputation and financial security, especially Mr. Fiorani's current and future employment, through the filing of the consumer complaints against both dealerships. That information was obtained from discovery in the two civil lawsuits filed against Crystal Ford and Ted Britt Ford in June, 1998 and July, 1998.

AFFIDAVIT 5

Agent Davies' affidavit makes reference to a Susan Parham and a Mr. David Riedenbach, who stated that Mr. Fiorani portrayed himself as a "Federal Bureau of Investigations (FBI) Agent" [and] . . . [a] Federal Agent from the Department of Justice."

-17-

Nowhere in the affidavit does it make any other references to support the second provision of a §912 violation. Also, when ~~that~~ those statements are read logically, it is a clearly false statement because it is illogical. What Agent Davies is expecting the Judge Buchanan to do is to believe that, a person will enter an office, arbitrarily introduce himself or herself for some unknown reason, then reintroduce himself or herself as "totally" someone else in a matter of just a few minutes.

Moreover, Mr. Fiorani had no business with either Mr. Reidenbach or Ms. Parham, and does not know either of them. The only reasons for their filing these false charges against Mr. Fiorani would be for spite, ill-will, intentionally jumping on the wagon to get Mr. Fiorani. Those reasons, however, are not as important as the facts that both of them filed a false criminal report or made false statements to the IRS, pursuant to §1001.

> (Title 18—Crimes and Criminal Procedure, United States Code, 1994) Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device or material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be find $10,000 under this title or imprisoned not more than five years, or both.

Likewise, Agent Davies is expecting a court of competent intelligence to not come to the conclusion that the statement by those two persons are clearly false. Nowhere in the statements does it make any relevant reference to how Mr. Fiorani came to

-18-

their office; what was discussed; when this happened; or why Mr. Fiorani would be coming to their office.

In a check of these statements, defense was able to obtain information that neither Mr. Reidenbach or Ms. Parham knew of Mr. Fiorani, except from information placed on the Fiorani's Web Page makes reference to a case, Omni Audio, that Mr. Reidenbach had read and told a third person about. Whereafter, Mr. Reidenbach made reference to it in his statement to Agent Davies, "... and complained that Ted Britt Ford would not release the government vehicle to him." That story was printed in the Fiorani Family Times Web Page prior to that statement, and Mr. Reidenbach was able to read the Consumer Affairs Complaint report from the 4th Floor, where the complaint was originally filed with a Mr. Roy Seger.

Furthermore, if the FBI or Department of Justice, other than the United States Attorney's Office, were equally as interested, they would have worked with the IRS. The FBI knew it was a false statement, so the FBI ignored it.

### AFFIDAVIT 6, CRYSTAL FORD
### JASON MINARD

Agent Davies then makes reference to interviewing a Mr. Jason Minard, Crystal Ford. In that interview, Minard stated to Agent Davies that "... [h]e was contacted by Rosario FIORANI on December 20, 1997." That is false. Mr. Fiorani was first contacted by a salesman, Mr. Mohamed Diallo, on the evening of December 19, 1997, who first faxed to Mr. Fiorani's home, an "invoice" (aka, window

-19-

sticker) of the prospective car for Mr. Fiorani's review, and so Mr. Fiorani can make the purchase of on the morning of December 20. (Aff.6. pg.3). That fact alone does not support any probable cause for a search warrant, since that fact is misleading and incorrect.

2.  Minard's next statement to Agent Davies consisted of, "FIORANI represented himself as a United States Treasury Agent (IRS) and that he wanted to purchase a vehicle, a 1997 "police package" Ford Crown Victoria that he said would be paid for by the United States Government."

There is no evidence either in the Affidavit, or in the Indictment that Mr. Fiorani made any such statements to anyone, or representations to anyone, except for Mr. Minard's allegations. Also, there is no evidence that Mr. Fiorani provided any such evidence, in a form of documents to Minard, 1) that he was an employee of the United States Treasury Agent; and 2), that no such documentary evidence that he would have it, the car, paid for by — THE UNITED STATES GOVERNMENT— as alleged by Minard.

However, there is direct evidence that Minard did illegally access, for his own purposes, Mr. Fiorani's Equifax Credit Report, pursuant to 15 U.S.C. §1681(q) and (n).  That, without Mr. Fiorani's permission or authorization.  Indeed, there is evidence from Equifax that Mr. Fiorani's credit report was accessed by Crystal Ford on December 20, 1997. And remember, Agent Davies made reference that Mr. Fiorani's credit report made reference to his FORMERLY being a U.S. Treasury Department employee, as stated in

-20-

paragraph #10.

3.  Minard next tells Agent Davies that, "Minard asked FIORANI ~~asked~~ for identification showing that he was a Treasury Agent because the (Equifax) credit report that he (Minard) pulled showed that FIORANI worked for Consumer Affairs and was <u>formerly employed</u> by the United States Treasury. (Aff. 6. pg. 4)

These statements made by Minard are clearly false, and are solely based on strictly private information obtained illegally, and pursuant to these facts, should be immediately excluded from any basis of probable cause, for being tainted and improperly obtained, under §1681 et seq of the Fair Credit Reporting Act.

Moreover, defense's evidence consists of a promissory note, which gives rise to defendant's claims that Minard illegally accessed defendant's credit report with a specific intent of obtaining private information on Mr. Fiorani for his own illegal purposes.  Agent Davies should have reviewed this information, prior to seeking (a) probable cause search and seizure warrants.

4.  Next, Minard states to Agent Davies that, "FIORANI advised him that he was working undercover and Consumer Affairs was his cover business." That statement is false. As stated above, in #3, Minard stated that Mr. Fiorani's credit report informed him that Mr. Fiorani was either working for Consumer Affairs and was a former employee of the U.S. Department of Treasury.  This information, presently, does not lead to any probable cause, had Agent Davies used any logic or reasoning before rushing to seek a

-21-

search and seizure warrant against Mr. Fiorani.

5.    Minard's next statement to Agent Davies was, "FIORANI repeatedly stated that he was working for a United States Government Agency, and he showed Minard credentials and a gold and blue badge." These two statements do not make logical sense and does not, if true, produce any recognizable evidence that any probable cause existed that a crime occurred.

First, Minard has apparently a retaliatory motivated ax to grind against Mr. Fiorani, since on January 10, 1998, Minard made a threatening, coercive and vulgar telephone call to Mr. Fiorani's home. (Pl. Evid. Doc.)  Again, had Agent Davies verified his information first, he would have been able to obtain such information from the Maryland Department of Consumer Affairs, the Federal Trade Commission, the Maryland Attorney General's Office and the Maryland Department of Motor Vehicles, which all had a copy of the documented threatening and vulgar telephone call of January 10, 1998.

Secondly, there is no evidence in either the Affidavit or the Indictment, which makes a person who produces a badge, a crime; and, that the evidence of a badge and credentials sufficient to set forth probable cause for a search.

6.    Minard's next statement rests on Mr. Fiorani producing business cards. Again, there is no crime in producing such cards. Alone, or in combination with these other false statements, do not make out any foundation that any crimes were committed by Mr.

-22-

Fiorani. However, what it does appear to be is that the businesses of Crystal Ford and Ted Britt Ford are intentionally using the Federal Government as their own form of "Muscle" to threaten, intimidate, coerce and under "the color of law", violate Mr. Fiorani's Constitutional Rights, pursuant to the Supreme Court's decisions in Re: Albright, Bivens and Leon.

Additionally, it was held by the U.S. Supreme Court in Albright that "deprivations of liberty were drafted in the Fourth Amendment, Due Process Clause as such:

> "We think this principle is likewise applicable here. The Framers considered the matter of pretrial deprivations of liberty, and drafted the Fourth Amendment to [Albright v. Oliver, 512 U.S. 266 (1994), n.8] address it." [and] The Fourth Amendment provides: "The right of the people to be secured in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . "

> See e.g. Torres, "(the challenged conduct must be "so egregious that it violates substantive or procedural due process rights under the Fourteenth Amendment.) Except insofar as our decisions have included certain substantive protections of the Bill of Rights —an extension I accept, because it is both long established and narrowly limited— I reject the proposition that the Due Process Clause guarantees certain (unspecified) liberties, rather than merely guarantees procedures as a prerequisite to deprivation of liberty." See. TXO Production Corp v. Alliance Resources Corp., 509 U.S. (1993).

[And]

> "We have held, of course, that the Due Process Clause protects interests other than the interests in freedom from physical restraint. See Michael H. v. Gerald D. 491 U.S. 110, 121 (1989) and, for purposes of this case, we can assume, arguendo, that some of the interests granted historical protection by the common law of Torts (such as the interests in freedom from defamation and malicious prosecution) are protected by the Due Process Clause."

(Alright). [And] "In the Bill of Rights, the Framers provided constitutional protections against "unfounded felony accusations." [Albright v. Oliver, 512 U.S. 266] (1994) n. 9.

In Re: the United States Supreme Court, In Re.: U.S. v. Price, 383 U.S. 787 (1966). The Supreme Court held:

"[t]hat private individuals who acted together with local law enforcement officials in the infamous 1964 murder case of three civil rights workers . . . acted "under the color of law" (and could therefore be charged under [18 U.S.C.] §242) even though they themselves were not law enforcement officers."

Therefore, on the basis of Mr. Minard's statements, as provided in the Affidavit, there is no foundation that Mr. Fiorani committed any crimes, except for the false and misleading statements found in their statements to Agent Davies.

Wherefore, on these facts and with defense's evidence, defense submits to the Court that the evidence obtained and secured through any search and seizure warrants should be excluded and suppressed , in accordance with the Constitution's Fourth Amendment, as an illegal search and seizure against Mr. Fiorani's rights to be secure in his home, person and property, as stated by the Framer's of the Bill of Rights.

## MOTION TO DISMISS, OR IN THE ALTERNATIVE DROP ALL CHARGES

Where those statements are also false and do not form the basis of a[ny] §912 violation, even in the remotest, Agent Davies should have verified his alleged facts first, before committing perjury in an affidavit before a United States District Court

-24-

Magistrate Judge Buchanan.

Therefore, for reasons set forth above, the search warrant should be dismissed, and all charges dropped against Mr. Fiorani, or in the alternative, DISMISSED, under the Fourth Amendment, illegal search and seizure, Fruits of the Poisonous Tree Doctrine and Exclusionary Rule, pursuant to United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d. 677 (1984), where the Supreme Court ruled,

> "Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in any affidavit that the affiant knew was false or would have known was false, except for his reckless disregard of the truth . . ."

> "We find such arguments speculative and conclude that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." United States v. Leon, (citations omitted).

Respectfully submitted by Defense, 09/29/98