<u>FIORANI v. TRIMPER, CASE NO.: CL 02-0491</u>
CIRCUIT COURT FOR CITY OF ALEXANDRIA
<u>PLAINTIFF'S MASTER LIST OF EXHIBITS</u>

1.  Memo, Govt's. **Ex. 4A**, Crystal Ford, w/-w/o Minard notes (12/20/97).
2.  Form, Features of Crown Victoria, (Govt's Exhibit 20), (12/19/97).
3.  Legal Document, <u>Plea Agreement, USDC-EDVA, 98-0340</u> (11/02/98).
4.  Legal Document, <u>Indictment</u>, Sept. Term, **w/and w/o marks** (09/09/98).
5.  Letter, by R. Fiorani, **to MD Atty Gen, Curran, Minard** (01/10/98).
6.  Affidavit *IRS Agents, Davies & Wanat*, **Search Warrants** (02/05/98).
7.  Legal Form, **Government's SF-50, Personnel, IRS,** (12/04/92).
8.  Legal Document, <u>Statement of Facts</u>, <u>USDC-EDVA, 98-340</u> (11/02/98).
9.  Legal Document, <u>MOTION TO SUPPRESS OR DISMISS, 98-340</u>, (09/19/98).
10. Note, by R. Fiorani, re: IRS Raid of home, Wanat/Davies (02/06/98).
11. Letter, **by R. Fiorani, to MD Atty Gen, Curran, Metcalfe** (12/23/97).
12. Memos, by R. Fiorani, to Trimper (before Supp. Hearing.) (10/21/98).
13. List, by **METROCALL, LIST OF TELEPHONE NUMBERS (Minard),** (01/23/98).
14. Contract, by Ted Britt Ford, (<u>Govt's Exhibit 16</u>) (Undated).
15. Form, by Minard, Deal Calculation Form (12/20/97).
16. Affidavit, by Greg Striker, **Gun List** of R. Fiorani, (09/10/98).
17. Letter, by **Stuart, to J. Cacheris, Sentencing letter** (12/09/98).
18. Letter, by **Ramona Fiorani, to J. Cacheris, Sentence ltr.** (12/09/98).
19. Legal Documents, by Trimper, <u>Position(s) of Defendant</u>, (10/30/98).
20. Form, by J. Metcalfe, Buyers Order, Crystal Ford, (12/22/98).
21. Legal Document, by R. Fiorani, **Ineff. Ass't, CA-00-6465** (04/26/00).
22. Letter, by R. Fiorani, to MD MVA, Anne Ferro, Admin., (01/14/98).
23. Form(s), **VA Gun Permit L-163430**, Congress' Lobby Id, (09/18/97).
24. Affidavit, by J. Wanat, IRS, Declaration to IRS, (10/27/98).
25. Letters, by H. Fahey, USA, Hackney's Misconduct Complt. (05/27/99).
26. Legal Document, **by Hackney,** <u>Sentencing Position of Govt</u>. (01/20/99).
27. Note, by R. Fiorani, IRS Arrest of Plaintiff, (09/10/98).
28. Letter, by Minard, to Montgomery Co., Ms. Wilder, (01/14/98).
29. Letter, by R. Fiorani, to **J. Cacheris, Withdraw Plea** (05/10/99).
30. Memo, **by R. Fiorani, ELEMENTS & REASONS FOR DISMISSAL** (Undated).
31. Form, by J. Minard, to R. Fiorani, Buyers Order, (12/20/97).
32. Form, **by Minard, Equifax Credit Report, pulled FCRA** (01/07/98).
33. Letter, by C. Bailey, **Dept. Treasury, IRS, SF-50,** (10/26/98).
34. Letter, by G. Carroll, IRS, Comm. Office, re: IRS RAID (08/21/98).
35. Letter, by unknown, Dept. Treasury, Inspector General, (07/20/99).
36. Application, by Fairfax County, BPOL, Business License (01/20/95).
37. Legal Document, by R. Fiorani, **Motion to Withdraw Plea** (05/10/99).
38. Letter, by R. Fiorani, to Ms. Wilder, Mont. Co., Ford, (01/24/98).
39. Report, by Unknown, Equifax Credit Report (w/Mona's SS) (Undated).
40. Legal Document, by R. Fiorani, **Ineff Ass't Counsel-2255** (Undated).
41. Letter, by J. Hillsman, Esq. to NASD, Employment issue, (02/04/98).
42. Legal Document, **by S. Williams, USPO, PreSentence Rpt.** (12/28/98).

43. Letter, by J. Landsman, to R. Fiorani, **MD DMV, Crystal** (09/04/98).
44. Contract, **by Minard, to R. Fiorani, Promissory Note**, (12/20/97).
45. Application, by Crystal Ford, Minard to R. Fiorani, Crd. (12/02/97).
46. Legal Document, **Govt's Position CJA's Ineff Ass't. Cl.**, (03/23/00).
47. Letter, by S. Roman, US DOJ, Office Prof. Resp., (11/03/99).
48. Letter, by S. Wilkinson, AUSA, USDC-SDMD, Hackney Comp. (08/09/99).
49. Form, Crystal Ford-Isuzu,(Defendant's Ex. 11), 98-340 (Undated).
50. Legal Document, **by Hackney, Government's Jury Instruct**. (11/02/98).
51. File, Larry Dube', Jr.(Settlement Agreement. IRS 1992) (12/04/92).
52. Appeal, **Plaintiff's Appeals to Court** Case No.: **CA-4108** (09/04/99).
53. Orders, by USDC, J. Cacheris, Rulings and Orders (Var date).
54. Orders, **by 4th Cir. Ct. of Appeals, to Trimpe**r, **CA-4108**, (06/30/99).
55. Web Page, by Crystal Ford, (pictures 2001 police cars), (Var date).
56. Legal Document, **by Progressive Ins. Co.**, (Pltf's. Exh.) (10/01/97).
57. Letter, by R. Fiorani, to **Comm. Rossetti, IRS, (¶ #10)** (06/02/98).
58. Card, Witness, Baumeister, Sheehy Ford, Springfield, (Undated).
59. Letter, by R. Williams, Spec Agt., In Chg. Justice, OPR (12/18/00).
60. Notes, Copies, Minard's and IRS Agt Davies' memo/notes (Var Date).
61. Letter, by C. Brinkerhoff, Esq. FTC, Credit Practices (10/08/99).
62. Transcripts, **by D. McCoy, USDC, EDVA, Plea Hearing**, (11/02/98).
63. Memo, by J. Butkovich, **to M. Thomas, Insp. Gen., IRS**, (03/23/99).
64. Letter, by R. Fiorani, **to Judge J. Cacheris, Grand Jury** (06/24/99).
65. Letter, by R. Fiorani, to Larry Dube, Jr., for Gardiner (03/02/98).
66. Lawbook, by Author, **3rd Ed. Search & Seizure** pp. xxix- (undated).
67. Letter, by R. Fiorani, to USDOJ, M. Chertnoff, Esq. (04/03/03).
68. Article, Wash. Post, **US Sup. Ct, Williams v. Taylor**, (02/28/00).
69. Letter, by J. Gonzalez, to D. Gonzalez, Inv., DOL, MD., (02/19/98).
70. Articles, **by Brooke Masters, Wash. Post, Indict & Plea**. (09/09/98).
71. Email, **9th Cir. Ct. Avila v. Galaza**, Ineff Ass't Counsel (07/22/02).
72. Statute/Code, Fed. 18 USC 1001, and State 18.2-425.1 (1998 Ed.).
73. Note, **by R. Fiorani, on Trimper, Probation Violation**, (07/27/00).
74. Articles, Washington Post, **Employment Arts, (Felons)** (12/15/02).
75. Statute, Fed. U.S.Code, **18 USC 1343**,(Wire Fraud) (2000 Ed.).
76. Letter, by R. Fiorani, to IRS TIGTA, (Perjury by IRS) (08/23/99).
77. Interview, **by K. Davies, IRS, from Sharon Wilder**, Mont. (01/30/98).
78. Letter, by R. Fiorani, to J Cacheris, CR. 98-0340 (03/04/03).
79. Copy, Concealed Weapon Badge, L-142516, (compare to...) (09/27/95).
80. Letters, by R. Fiorani, to J Cacheris, **Grand Jury Trans** (06/07/00).
81. Letter, by M. Manno, to J Cacheris, (Sentence Letter) (12/09/98).
82. Letter, by J. Jones, Esq. to J Cacheris, (Sentence Ltr) (12/09/98).
83. Cards, Collection of Federal Agent Cards, CR-98-0340 (Undated).
84. Letter, by R. Fiorani, to **Judge Buchanan, Viol Prob Hrg** (07/17/00).
85. Report of Inv., by M. Radetic, SA, TIGTA wrongdoing IRS (09/14/99).
86. Court Appeal, by R. Fiorani, **U.S. Supreme Court, 2255**, (10/00/99).
87. Interview, by K. Davies, SA, IRS, Susan Barham, FFX Co. (02/02/98).
88. Court Appeal, by R. Fiorani, **4th Cir. Ct., CA-00-7615**, (06/30/01).
89. Memo, by **Dep. Reg. Dir., J. Butkovich, IG, to Br. Chief** (03/23/99).

90.  Legal Document, Clerk's Ofc., **USDC-EDVA, Docket 98-340A** (11/09/99).
91.  Affidavit, for R. Fiorani, by L. Dube, Jr., Esq., IRS,    (08/13/92).
92.  Court Appeal, by R. Fiorani, **4th Cir. Ct., CA-99-6727**, (10/14/99).
93.  Letter, by R. Fiorani, to Merit System Protection Board  (10/05/98).
94.  Legal Document, by USA, Merit Systems Protection Board,  (10/28/98).
95.  Report, by AUSA, to USDC, **Hrg on Viol of Prob. & Order**, (07/21/00).
96.  Appeal, by R. Fiorani, 4CCA, **Motion to Chg Venue 00-7615** (11/06/00).
97.  Article, by Washington Post, *Car sale, Ford police cars* (09/11/01).
98.  Court Appeal, by R. Fiorani, **U.S. Sup Ct. Cert. 99-7773** (01/11/00).
99.  Legal Document, by G. Trimper, Memo Mod of D's Cond Rel   (07/26/00).
100. Article, by Wash Post Job Ad, Fair Housing Counsel, Inv. (10/??/97).
101. Bill, by **Telephone Company**, *Four separate calls to son*. (02/06/98).
102. Transcript, by M. Rodriguez, *Order by J. Ellis, No Show*. (01/29/99).
103. Order, Judge Ellis, **ORDER FOR ALL COUNSEL OF RECORD**.    (01/28/99).

# Lawyers Seek Names Of Officers Who Lied

## Montgomery Verdicts May Be in Doubt

By KATHERINE SHAVER and STEVEN GRAY
*Washington Post Staff Writers*

Montgomery County prosecutors are questioning whether dozens of criminal convictions could be jeopardized by eight police officers who Police Chief Charles A. Moose recently revealed are still on the force even though they were found to have lied.

Moose has said state law protecting police officers' privacy forbids him to release the eight officers' names, but Deputy Montgomery State's Attorney Katherine Winfree said yesterday that prosecutors are seeking a meeting with Moose to obtain the names.

"As a prosecutor, I'm concerned about what lies a police officer told," Winfree said. "If it's a police officer who makes arrests and testifies against people, it could have a bearing on whether we feel comfortable sponsoring that person as a witness. It's something we need to resolve."

Moose's revelations came during a speech to police academy

See MONTGOMERY, B4, Col. 1

# Montgomery Prosecutors to Ask Chief for Names of Officers Who Lied

**MONTGOMERY, From B1**

graduates last week in which he expressed outrage that eight officers, found to have lied over the past five years "continue to carry a badge and a gun and drive about the county arresting people, going to court and testifying."

Moose's comments sparked criticism from some police officers who said his blunt remarks unfairly branded the department as a whole, though County Executive Douglas M. Duncan (D) said he endorsed his new police chief's insistence on truthful officers.

Prosecutors aren't the only ones who say they will be seeking the officers' names to determine what role their credibility may have played in previous court cases, Defense lawyers also are clamoring for the list, saying they had assumed the police department wouldn't employ officers who lied.

Several lawyers, including the county's chief public defender, said yesterday they might want to challenge past convictions based on the officers' testimony or arrests based on the officers' search warrants or traffic stops.

Public Defender Eugene Wolfe, whose office represents the most defendants in the county, said he doubts that Moose, who must maintain the support of his officers and good relations with the police union, will provide the names of the officers voluntarily.

"If there is a person doing a substantial amount of jail time, and if it's based on that officer's credibility, we want to know that," Wolfe said.

A summary of recent internal affairs investigations, provided by the police department, shows that officials have investigated other incidents in the past two years that also could raise questions about some officers' credibility.

From January 1997 through Sept. 20 of this year, the department substantiated five cases in which officers submitted inaccurate or incomplete reports and two cases in which officers violated department rules on handling evidence, according to the summary report. One officer is still being investigated for allegations of perjury, and five out of 61 complaints of excessive force were sustained.

Allegations of lying were sustained in four instances in the past two years, the statistics show.

It is unclear from the information provided by the police how many of the officers against whom the allegations were sustained are still on the force. Prosecutors and defense lawyers say that because they do not know which officers are involved and whether they are still making traffic stops and arrests, it is difficult to assess how many criminal or traffic court cases might be affected.

Police officials said they could not give immediate statistics on how many officers had been fired in the past few years or why. The information about the internal affairs investigations did not say what discipline, in any, was meted out in any of the cases.

The summary was organized by type of allegation and doesn't indicate whether one complaint was lodged against several officers or whether one officer was named in several kinds of complaints. The department did reveal that 32 officers have had two or more complaints in the past two years.

Moose said yesterday that he has faith in the internal affairs unit's integrity but noted that it has been short-staffed and is not computerized, leaving the department unable to track complaints.

He said he expects the number of complaints to rise sharply next year, after the internal affairs unit, instead of commanders at the district station level, determines which complaints deserve formal investigation.

"We'll do more talking about this issue, encouraging people to report," Moose said. "So, when there's a spike [next] year, will I be concerned? No, because that means we are doing more."

The way Montgomery police handle internal affairs allegations—the investigative files are kept secret—has surfaced in complaints from the local NAACP that the department has not taken seriously reports that some officers harass and brutalize minorities. The U.S. Department of Justice also is investigating those allegations.

Moose, who became chief in August, has ordered that, as of Nov. 1, complaints against officers may no longer be handled informally at the station level without being reported to internal affairs. A 240-page report released last month by the County Council's Office of Legislative Oversight found that the current complaint process is archaic and ambiguous to average citizens and police.

More important, prosecutors and defense lawyers agree, untruthful or untrustworthy police officers can have grave and far-reaching ramifications in the criminal justice system.

Rebecca Nitkin, co-chair of the criminal law section of the Montgomery County Bar Association, said defense lawyers planned to discuss the issue at their monthly meeting last night, including whether they will seek the names through a public records request or through a lawyer subpoenaing the names in a future criminal case.

context."

Bader said he believed Moose was "throwing things out without getting the factual basis, and now there's going to be all this inquiry and suspicion that is totally unwarranted."

Montgomery's legal circles are abuzz, however, not because of the relatively few officers who have been found culpable out of the more than 1,000 officers on the force, but because internal affairs files are closed, and no one knows the gravity of the officers' actions or which of those officers are still on the force.

Defense lawyers might want to cross-examine a police officer about his internal affairs record to argue to a judge or jury that the officer's testimony can't be trusted, Nitkin said. Officers also obtain search warrants based solely on their sworn testimony, and many verdicts come down to a defendant's word against a police officer's, Nitkin said.

"It's a very big deal," Nitkin said. "It's destroying the morale of the police officers who are trying to do the right thing. It's hurting the state's attorney's office if they don't want to win cases on perjured testimony. Obviously, it hurts defendants most. They can lose due to perjured testimony."

"The worst part," said defense attorney Patricia Harvey, "is that the department knew these officers lied about something in the performance of their jobs and left them in their jobs."

Tom Heeney, a Rockville lawyer who gets client referrals from the NAACP, said Moose's revelation shows the need to make the internal affairs system more open and accountable.

"Our system of justice virtually depends on truth-telling from the witness stand," Heeney said. "Without it, the system could implode."

*Staff writer Craig Whitlock contributed to this report.*

---

## Results of Internal Affairs Investigations
*Conducted January 1997 – Sept. 20, 1999*

### Complaints likely to originate within police department

| | Officers investigated | Untruthful statements | Unsatisfactory performance | Compliance with orders | Secondary employment | Conduct unbecoming | Punctuality | Integrity of reporting system | Conformance to law/ evidence | Conformance to law/ perjury |
|---|---|---|---|---|---|---|---|---|---|---|
| Allegations sustained | 6 | 4 | 25 | 8 | 10 | 26 | 9 | 7 | 2 | 1 |
| Allegations not sustained | | | 14 | 7 | 3 | 10 | 7 | 5 | 2 | |
| Unfounded (did not happen) | | 1 | 0 | 1 | | 2 | 1 | | | |
| Exonerated | | 2 | | | 1 | 3 | 1 | 1 | | |
| Administrative closure | | | 3 | | 1 | 4 | | | | |
| Policy failure | | | | | | | | | | |
| Incomplete | | | 1 | | 4 | 6 | 1 | | | 1 |

### Complaints likely to originate with citizens

| | Discrimination/ harassment/use of derogatory language | Use of force | Abuse of authority | Conformance to law/ assault |
|---|---|---|---|---|
| Allegations sustained | 22 | 5 | 3 | 18 |
| Allegations not sustained | 61 | | | 21 |
| Unfounded (did not happen) | 1 | 17 | 4 | 1 |
| Exonerated | 4 | 11 | 2 | 6 |
| Administrative closure | | 10 | 5 | 9 |
| Exonerated | | 9 | 4 | 1 |
| Policy failure | | 6 | 1 | |
| Incomplete | 4 | 12 | 3 | 1 |

**Sustained:** Sufficient evidence to prove the allegation of misconduct
**Not sustained:** Insufficient evidence to prove or disprove the allegation
**Unfounded:** The incident did not occur
**Exonerated:** The incident occurred; the actions were justified, lawful, proper
**Administrative closure:** No investigation occurred for various reasons
**Policy Failure:** Incident occurred; however, there are omissions in policy or established policy was insufficient or ineffective

SOURCE: Montgomery County Police Department
THE WASHINGTON POST

**B2**  SATURDAY, OCTOBER 23, 1999     s

# CRIME & JUSTICE

## VIRGINIA

### Abusive Passenger Gets Four Months

A Belgian man who yelled at passengers and crew members during a transatlantic flight in August was sentenced yesterday in U.S. District Court in Alexandria to four months in prison.

Frank Janicki, 37, pleaded guilty last month to verbally assaulting and intimidating a United Airlines crew member during a flight from Belgium to Dulles International Airport.

According to court documents, Janicki was on Flight 951 on Aug. 29 when he became loud and abusive.

Janicki also was ordered to pay a $5,000 fine. His attorney, Glen A. Trimper, could not be reached for comment yesterday.



### Child Pornography Brings Sentence



# Committee On Finance
### William V. Roth, Jr., Chairman

---

**NEWS RELEASE**                                                      www.senate.gov/~finance

FOR IMMEDIATE RELEASE                    Press Release # 105 - 306
April 28, 1998                           Contact: Ginny Flynn 202/224-4288
                                                  Christina Pearson 202/224-5218

## IRS OVERSIGHT HEARINGS DAY TWO: BUSINESS OWNERS RECOUNT EGREGIOUS ENCOUNTERS WITH THE IRS; NAACP PRESENTS TESTIMONY ON RACIAL DISCRIMINATION; EXPERTS DISCUSS AGENCY'S USE OF EXAGGERATED STATISTICS

WASHINGTON -- The Senate Finance Committee plans to conduct tomorrow its second day of IRS oversight hearings. The hearing will begin at 9 am in room 216 Hart.

### Witnesses

The Committee will hear testimony from the following witnesses:

**Panel #1**
John Colaprete of "The Jewish Mother" restaurant in Virginia Beach, Virginia.
William A. Moncrief, Jr., of Moncrief Oil Company in Fort Worth, Texas.
Richard Gardner of Gardner's Tax Service in Tulsa, Oklahoma.

**Panel #2**
Leroy W. Warren, Chairman of the NAACP Criminal Justice Committee.

**Panel #3**
David Burnham, Co-director of Transitional Records Access Clearinghouse (TRAC).
Susan B. Long, Co-director of Transitional Records (TRAC).

## SUMMARY INFORMATION BELOW EMBARGOED FOR USE UNTIL 9 AM ON WEDNESDAY, APRIL 29

### Summary of Day Two

*The first panel consists of taxpayers who have experienced an IRS Criminal Investigations Division (IRS-CID) armed raid -- raids which were often based on*

- MORE -

*flimsy evidence. These witnesses recount the embarrassment and humiliation of an IRS raid, and the toll taken on personal lives and businesses. The taxpayers themselves were not the only ones effected by the IRS-CID investigations -- in some cases, their employees were harassed, their clients were asked to assist in the investigations, and their children and employees were held at gunpoint.*

### Summary of John Colaprete's Testimony

- IRS-CID carried out simultaneous armed raids of his restaurant (with customers present), home and the restaurant manager's home on charges of money laundering, gun running and drug dealing (March 1994).
- Charges were based on allegations by his former bookkeeper, who had also embezzled approximately $40,000 from his business. The IRS spent less than 48 hours investigating her allegations before conducting the raid.
- In the process of the raid, the front door of Colaprete's home was torn from its hinges. Colaprete's personal papers were taken. Even his dogs were impounded.
- The manager was pulled at gunpoint from the shower and restrained from calling his lawyer. His teenage son was forced to the floor at gunpoint.
- Charges were never filed. After four months, a truck pulled up to the business and dumped the seized items on the sidewalk. Some of his personal possessions have yet to be returned.
- Colaprete and the restaurant manager both suffered deep depression as a result of the IRS raid.
- The bookkeeper has since gone to jail for embezzling other employers.

### Summary of William A. Moncrief's Testimony

- His family-run oil company was raided by IRS agents in September 1994 based on the allegations of a disgruntled former employee. The agents prominently flashed their guns and even removed sheet rock from the walls.
- Someone alerted the media in advance of the raid -- though investigations are supposed to remain confidential -- so many reporters were on hand to report the raid. The publicity caused Moncrief's business to go into a tailspin, causing damages of $100 million to his business.
- His computer system and all his files were confiscated and stored in a warehouse. For a while, to check a file or have access to a checkbook for his business, Moncrief needed to receive permission from the IRS.
- After 16 months, though Moncrief had gathered evidence proving his innocence, the IRS would not drop the case without a monetary settlement. Worn down, he paid $23 million in a settlement, though the IRS never did a civil audit to establish if he did owe any additional taxes.

### Summary of Richard Gardner's Testimony

- Though his office property was seized in March 1995 by armed agents, it took nearly two years for the IRS to indict Gardner. He feels he was targeted by the IRS because he was one of the largest tax preparers in Oklahoma.

- MORE -

- During his ordeal, the IRS
  - lied to a grand jury on the indictments -- many clients listed on the indictment knew nothing of the proceedings; and
  - tried to force his clients to wear hidden microphones, and hinted they, too, would have problems with the IRS if they did not comply; and
  - the agent in charge of the investigation admitted to having a personal vendetta against Gardner.
- The IRS could not prove any wrong doing after a 33 month investigation. By January 1998, the IRS had dropped counts against him.

*The second panel consists of testimony from the NAACP discussing racial discrimination problems within the IRS.*

### Summary of Leroy Warren's Testimony

- The NAACP has received a variety of complaints and allegations, including:
  - IRS management refuses to fairly address valid complaints of racial discrimination;
  - Retaliation against employees who file EEO complaints;
  - Allegations of racial and sexual discrimination in promotions;
  - Long-term career black employees train white employees -- who quickly become the supervisors of the black employees;
  - "IRS management has frequently promoted marginally qualified or possibly unqualified individuals, including a few blacks, to higher level jobs or positions as a reward for supporting racism, racist policies, and/or whatever management does"; and
  - "A new IRS Commissioner surrounded by senior level career employees who caused the problem will not solve IRS's internal problems. IRS senior management, legal staff and EEO staff are major contributors to the internal problems within the IRS."

*The third panel discusses the IRS-CID's lack of internal oversight, consistency and accountability. Unable to keep accurate records, the IRS-CID claims an exaggerated level of effectiveness in its prosecution and conviction of tax fraud defendants.*

### Summary of Susan Long and David Burnham's Testimony

- The CID is unable to keep track of the work of its 3,352 criminal investigators.
- The nation's tax laws are enforced in an erratic way throughout the U.S.
- It is the lack of accountability inherent in the CID's faulty bookkeeping system that undermines the ability of the CID to enforce the nation's tax laws in an effective and fair way.
- When the senior managers of the CID can't keep track of the activities of their agents, systematic supervision is impossible. Lacking effective internal oversight, genuine abuses by individual agents can easily go unnoticed.

- MORE -

# MENTAL ILLNESS, YOUR CLIENT, AND THE CRIMINAL LAW:

# A HANDBOOK FOR ATTORNEYS WHO REPRESENT PERSONS WITH MENTAL ILLNESS

Created and Distributed by Texas Appleseed
with Generous Support from the Hogg Foundation
for Mental Health

February 2002

*This is the model being used for the US Atty. and Dept of Justice Dept.*

# WASHINGTON IN BRIEF

## TVA Is Free to Ignore EPA Orders for Now

A federal appeals court told the government-owned Tennessee Valley Authority yesterday that, for the time being, it is "free to ignore" Environmental Protection Agency orders to clean up pollution at several of its coal-burning power plants.

The decision from a three-judge panel of the Atlanta-based U.S. Court of Appeals for the 11th Circuit came in a test case challenging an aggressive initiative by the Clinton administration and states to reduce smokestack emissions from aging coal-fired power plants.

Judge Gerald Tjoflat wrote that the EPA must first prove in a federal district court its claims that the TVA violated the Clean Air Act when it revamped nine coal-fired electric power plants without obtaining permits. The EPA had issued an "administrative' compliance order" (ACO) for the TVA to make expensive pollution control improvements at the plants, prompting the TVA's challenge in court.

Tjoflat said the appeals court lacks jurisdiction to review the EPA order because it is not a final agency action. Until the EPA proves a violation in court, he wrote, "TVA is free to ignore the ACO without risking" penalties for not complying.

## Cases of Prosecutorial Misconduct Detailed

State and local prosecutors stretched, bent or broke rules so badly in more than 2,000 cases since 1970 that appellate judges dismissed criminal charges, reversed convictions or reduced sentences, according to the first national study of prosecutorial misconduct.

The study, "Harmful Error," found 223 prosecutors across the nation who had been cited by judges in two or more cases of unfair conduct but only two prosecutors who had been disbarred in the past 33 years for the mishandling of criminal cases. There are about 30,000 local prosecutors in 2,341 jurisdictions.

A product of three years of research by the Center for Public Integrity, a private ethics watchdog group, the study also found 28 cases involving 32 defendants in which judges concluded that prosecutorial misconduct contributed to the convictions of innocent people who were later exonerated. Some of these defendants had been convicted of murder, rape or kidnapping; some had been sentenced to death before exoneration spared them.

Charles Lewis, executive director of the center, said that by focusing only on cases in which appellate judges found misconduct, the study presented "an extremely conservative and undoubtedly understated picture of the problem." The study also excluded federal prosecutors.

Astoria, Ore., District Attorney Joshua Marquis, a National District Attorneys Association board member, said the cases that were cited emerged "from a universe of millions." The results suggested that the problem was "episodic, not epidemic," and that prosecutors "are and should be subject to a high degree of scrutiny by trial and appellate judges, defendants and defense lawyers, the press and bar associations and, ultimately, the voters," Marquis added.

*Compiled from reports by the Associated Press*

*[handwritten annotation:]* NOT DONE AT ALL BY CORRUPT JUDGES SEE CT. RULINGS.

Case 1:06-cv-00739-RWR    Document 17-17    Filed 09/07/2006    Page 12 of 16

# Misconduct Cases Rise At Justice Department

## Reno Has Sought to Resolve Allegations Faster

**By Jim McGee**
Washington Post Staff Writer

Last fall one of the country's most respected trial judges delivered a hard blow to the Justice Department. U.S. District Court Judge William Hoeveler accused one of Justice's veteran prosecutors of "bad faith," and overturned guilty verdicts in a huge savings and loan fraud case.

After sitting through the three-month trial, the judge said he realized the government had no credible evidence against the defendant. He criticized the conduct of a federal prosecutor and said the prosecutor had withheld crucial exculpatory evidence in order to prevail in a weak case.

"The enthusiasm and aggressiveness with which the prosecution pursued this case was certainly commendable, at least in its early stages," Hoeveler said. "Unfortunately, that aggressiveness ultimately led to excesses."

Hoeveler's conclusion offered new support for the old claim by defense attorneys that federal prosecutors routinely hold back evidence that will hurt their case. It also poses a new challenge for the department's overburdened Office of Professional Responsibility (OPR), which Attorney General Janet Reno has sought to make more accountable and adhere to stricter guidelines.

And now a newly released annual report—covering OPR activity for fiscal 1994—shows that the number of confirmed cases of professional misconduct continues to rise, tripling from seven in 1993 to 22 in 1994. Currently, OPR counsel Michael E. Shaheen Jr. says, more than 100 significant cases are under active investigation by the 17-lawyer OPR staff.

"The [1994] increase was partially attributable to the greater number of attorney matters closed during fiscal year 1994 [407 vs. 243]," Shaheen said. He also pointed to the near doubling of federal prosecutors during the 1980s, the use of misconduct claims as a defense tactic, the addition of more lawyers to OPR's staff, Reno's push to have serious allegations resolved more rapidly and the federal judiciary's growing impatience with cases that appear to offend notions of fairness.

"Our job is to vindicate a lawyer when they've been unfairly or inappropriately accused, but to address allegations when they're substantiated," Shaheen said. "It's in the interests of the department to call out those that don't belong here."



**JANET RENO**
*...pressed accountability standards*

She has tried to layer in funding for the internal watchdog units at the Justice Department, which include OPR, the Office of Intelligence Policy and Review and the Office of Inspector General.

In an effort to bring greater openness to the discipline process, Reno implemented a policy that allows public summaries of important OPR cases to be released, but the disclosures are moving at a glacial pace. In fiscal 1994, OPR completed a review of 407 cases involving attorney misconduct—sustaining 22 allegations. Twelve public summaries have been released.

"OPR was asked to expedite the public release of information about high-visibility matters in which the public had the greatest interest and it has responded well," said department spokesman Carl Stern. "In the last three working days it has put out three reports naming names and explaining in detail the conclusions it has reached."

Two of the department's most problematic summaries that have yet to be released include the 1989 case in Chicago when three trial judges overturned convictions against the notorious street gang, the El Rukns. The judges concluded that the prosecutor, Assistant U.S. Attorney William R. Hogan Jr. "withheld" exculpatory evidence and "suborned perjury" from government witnesses.

The other was an international heroin trafficking case in California that went bad after a prisoner from China, Wang Zong Xiao, was brought to the United States by Chinese authorities to testify for the government in a drug case.

During the trial Wang admitted

---

And why not? If you can't figure out how to fund the government for the rest of the year, or an omnibus welfare or health care reform, you might as well kill trying to amend the Constitution.

Especially when the ready looks like the menu in a Chinese restaurant. As of last week, senators and House members filed 139 proposed constitutional amendments during the current Congress—and there are nine months to go!

They've got proposed amendments addressing school prayer, busing and abortion want to get rid of the Electoral College, change the meaning citizenship and abolish the death penalty.

There are at least 26 prescriptions for balancing budget, and those who want more can back the "Public" amendment proposed by Rep. Owen B. Pickett (D-Va.), require a national referendum when the feds want to borrow beyond a certain limit. How's that for squatting on federal spending.

Suspicions that a constitutional amendathon was in the works surged in 1995 with the arrival the first Republican Congress in four decades. Disgusted with left turn the republic took their absence, the new kids madly second-guessing the Founding Fathers a couple centuries after the fact.

Well, a little research shows perception to be a vicious twisted exaggeration, prolonged perpetrated by Democrats Congress loves to amend the Constitution.

Back in the 1960s and lawmakers routinely filed than 300 amendments, topped 1969 with 772. And even last stale Democratic decade

## Postmaster Sticks Wit Stamp Vov

*Runyon Says He'l To Keep Rates Ste*

**By Bill McAllister**
Washington Post Staff Writer

Postmaster General Ma Runyon yesterday reconfir earlier pledge to avoid b the price of a stamp next y promised he will attempt t the 32-cent stamp until t 2000.

"You have my word: Th be no increase in stamp through 1997," Runyon National Postal Forum in A Calif. He also said the age

Case 1:06-cv-00739-RWR   Document 17-17   Filed 09/07/2006   Page 13 of 16

here to stricter guidelines.

And now a newly released annual report—covering OPR activity for fiscal 1994—shows that the number of confirmed cases of professional misconduct continues to rise, tripling from seven in 1993 to 22 in 1994. Currently, OPR counsel Michael E. Shaheen Jr. says, more than 100 significant cases are under active investigation by the 17-lawyer OPR staff.

"The [1994] increase was partially attributable to the greater number of attorney matters closed during fiscal year 1994 [407 vs. 243]," Shaheen said. He also pointed to the near doubling of federal prosecutors during the 1980s, the use of misconduct claims as a defense tactic, the addition of more lawyers to OPR's staff, Reno's push to have serious allegations resolved more rapidly and the federal judiciary's growing impatience with cases that appear to offend notions of fairness.

"Our job is to vindicate a lawyer when they've been unfairly or inappropriately accused, but to address allegations when they're substantiated," Shaheen said. "It's in the interests of the department to call out those that don't belong here."

After taking office, Reno faced a large backlog of OPR cases left over from the Bush administration. Despite an increase in the number of federal prosecutors, the tiny six-lawyer OPR staff had not grown in size since 1979. Three years into the job, Reno has added lawyers to the OPR staff and made it a high priority. Reno said, "We still have a ways to go, but are pleased with the substantial progress we have made so far."

Nonetheless, after three years Reno has her own inventory of problematic cases.

For example, last year a massive drug racketeering case in Utah, which reportedly cost $10 million to prepare, collapsed after a judge said the evidence failed to support the main charge, prompting the jury to acquit the defendant. The department declined to appeal, the local U.S. attorney said, because of credibility problems with the government witnesses. It is not clear how the case got through the review process at the Criminal Division and was approved by the U.S. attorney in Utah.

Shaheen said Reno insists that OPR took hard at the department managers during its inquiries. "She wants to supervise the whole account," Shaheen said, and have them ask, "How could this have happened, if you were doing your job right?"

Reno also has tried to shore up the internal affairs process in ways that would win the confidence of the federal judiciary without alienating her core constituency of 7,000 federal prosecutors.

misconduct—sustaining 22 allegations. Twelve public summaries have been released.

"OPR was asked to expedite the public release of information about high-visibility matters in which the public had the greatest interest and it has responded well," said department spokesman Carl Stern. "In the last three working days it has put out three reports naming names and explaining in detail the conclusions it has reached."

Two of the department's most problematic summaries that have yet to be released include the 1989 case in Chicago when three trial judges overturned convictions against the notorious street gang, the El Rukns. The judges concluded that the prosecutor, Assistant U.S. Attorney William R. Hogan Jr. "withheld" exculpatory evidence and "suborned perjury" from government witnesses.

The other was an international heroin trafficking case in California that went bad after a prisoner from China, Wang Zong Xiao, was brought to the United States by Chinese authorities to testify for the government in a drug case.

During the trial Wang admitted from the witness stand that his testimony was false. Later, U.S. District Court Judge William H. Orrick found that Chinese authorities used cattle prods, repeated beatings and threats of execution to obtain his confession.

Recently the 9th U.S. Circuit Court of Appeals affirmed Orrick's findings. "Members of the prosecution team were aware of human rights abuses occurring in [China] and suspected that Wang might have been tortured when he gave his confession," the court's opinion read. "Nonetheless, the prosecution ignored this evidence, failed to disclose any of it to the defense counsel and arranged for Wang to testify."

Like many of the most serious OPR cases, the Wang case touches upon a larger issue for the department. In an effort to combat foreign drug cartels, ethnic mafias and terrorist groups, Reno is aggressively trying to expand the Justice Department's role overseas. This week she is in Budapest with FBI Director Louis J. Freeh to celebrate the first anniversary of a U.S.-backed police training academy.

But the Wang case also points to the difficulties that can arise when U.S. authorities conduct joint efforts with other countries. Experts testified that Chinese authorities routinely torture criminal suspects to obtain confessions. Such practices could complicate plans by the FBI and the Drug Enforcement Agency to station agents in Beijing, where they would be working with Chinese authorities on criminal cases.

# Postma Sticks Stamp

*Runyon Says To Keep Rat*

By Bill Mc&#x2026;
Washington Post

Postmaster Gen&#x2026;
Runyon yesterday&#x2026;
earlier pledge to&#x2026;
the price of a stamp
promised he will at&#x2026;
the 32-cent stamp
2000.

"You have my w&#x2026;
be no increase in&#x2026;
through 199&#x2026;," R&#x2026;
National Postal For&#x2026;
Calif. He also said
set "an unprece&#x2026;
keeping rates lev&#x2026;
a row.

But that will r&#x2026;
change and breakt&#x2026;
mance" he told th&#x2026;
commercial mailer&#x2026;
also will keep the p&#x2026;
Postal Service and&#x2026;
curtail costs and to&#x2026;
revenues for the f&#x2026;
perhaps through ne&#x2026;
Congressional st&#x2026;
erday the agency l&#x2026;
Hill that it intends t&#x2026;
an electronic fund&#x2026;
tem in California a&#x2026;
will allow postal cus&#x2026;
money to Mexico i&#x2026;
ing postal money or&#x2026;

The postmaster&#x2026;
other goal, one th&#x2026;
previous postmaste&#x2026;
pledged to have del&#x2026;
placed on all first-c&#x2026;
end of 1998. The&#x2026;
to sort mail and&#x2026;
chines rather than&#x2026;
sort the mail.

Former postmast&#x2026;
thony M. Frank o&#x2026;
that the agency w&#x2026;
percent of its letter&#x2026;
by 1996, but post&#x2026;
said only 67 perce&#x2026;
was bar-coded duri&#x2026;
That had led to mu&#x2026;
the agency's $4.7&#x2026;
tion program, whic&#x2026;
funded yesterday.
short of a revolutio&#x2026;
mailers.

*Handwritten annotations in margins:*
- "Nightline" — "Grand Juries" will indict a hamburger
- Heavy corruption in Grand Juries
- Rubber stamp [illegible]
- DOES NOT APPLY
- Plenty to uncover in corruption in Grand Juries cases [illegible] to TPK

## VIRGINIA

# Some Question Sheltering of Alexandria Grand Juries

BUNKER, From B1

"contrary to American values," Benjamin said. "It has this aura of an omnipotent government bringing witnesses under lock and key into a secret area of a government building. That's a little creepy."

"We've been seeing an atmosphere of secrecy sort of closing down like a curtain over the justice system," said Lucy Dalglish, executive director of Arlington-based Reporters Committee for Freedom of the Press. She and others who monitor the courts attribute the trend to a public concern about crime, the focus on terrorism cases since the Sept. 11, 2001, attacks and a backlash against such high-profile trials as the O.J. Simpson case.

Prosecutors and court officials argue that Alexandria is a model of discretion that allows the grand jury to do its work while being fair to witnesses, who may be investigated and never charged.

Paul J. McNulty, the U.S. attorney in Alexandria, declined to comment. Richard Cullen, who was U.S. attorney when the courthouse was designed in the early 1990s, said witnesses should be able to enter and leave the grand jury area without having their identities known.

"There may be cases where there is a public interest in knowing what is going on with an investigation, whether the prosecution is doing its job, and that is legitimate," Cullen said. "But sometimes, you have to balance competing legitimate interests." In some cases, such as those involving violent gangs, the identities of witnesses and grand jurors need to be protected for safety, he said.

Federal grand juries consist of 23 randomly chosen registered voters who hear evidence and decide whether to issue indictments. Federal rules prohibit prosecutors and grand jurors from discussing the proceedings. But witnesses are free to speak, and reporters traditionally have conducted "grand jury stakeouts" to see who comes in and out.

In Alexandria, grand jurors have indicted such high-profile defendants as Zacarias Moussaoui, an alleged Sept. 11 conspirator, and convicted spy Robert P. Hanssen.

A quest for secrecy was behind the decision to conceal the grand jury area under the staircase and the rest of the second floor at the Alexandria courthouse. Howard Melton, the building's principal designer, attributed the design to the desire of the U.S. attorney's office "to get witnesses in front of the grand jury out of the eyes of the public."

Melton, who said the layout was appropriate, said he knew of federal guidelines when the courthouse was designed but recalled none governing the grand jury area. Federal officials said that guidelines took effect in 1991 but that those pertaining to grand juries have not changed.

"Obviously, they didn't follow their own guidelines and they let the prosecutors specify their own design," said Don Hardenbergh, a Williamsburg-based courthouse design consultant who wrote a design guide for courts. "The grand jury area is not accessible by the public at all."

Benjamin said witnesses could feel pressured to testify in favor of the government, the same way a suspect might feel compelled to confess under questioning in a police station.

"The whole idea behind grand jury secrecy is to permit complete honesty, but you can make something so intimidating and so dominated by the government presence that you lose that neutrality," he said.

Edward A. Adams, spokesman for the Alexandria courthouse, said the layout meets federal guidelines in part because grand jurors enter the 10-story, red-brick building through the front door with the rest of the public. They then go up public staircases or an escalator to the gleaming marble columns of the second floor before they are met by security officers, who take them to the first floor using the special elevator key.

Prosecutors can ferry witnesses to the grand jury area — or reach it themselves — through a passageway from their office that goes directly there.

Experts on the court system said the level of secrecy in Alexandria is rare. In an informal survey, the Williamsburg-based National Center for State Courts found that state and local grand juries nationwide meet in secret but not in rooms sealed off from the public.

"I don't want to say that nobody has the same situation as Alexandria, but boy, none that I've heard of," said Lorri Montgomery, a spokeswoman for the group.

Dick Carelli, a spokesman for the Administrative Office of the U.S. Courts, said most of the nation's older federal courthouses do not restrict access to grand jury areas.

"For example, at the courthouse in the District, witnesses and prosecutors walk through a fully public hallway to get to the restricted grand jury area.

"It seems to have worked well for us here," said Channing Phillips, a spokesman for the U.S. attorney's office in the District. "If we are worried about someone's identity being disclosed, obviously there are ways around that. But usually, that's not an issue or problem."

Many of the newer federal courthouses, however, do restrict access, Carelli said.

Steven Aftergood, director of the Project on Government Secrecy run by the Federation of American Scientists, said he had never heard of such a cloistered grand jury.

"The very layout of the building is designed to frustrate public access," Aftergood said. "They've gone beyond secrecy to a kind of meta-secrecy."

---

*(Adjacent obituary/memorial column fragments:)*

Adventists, died Sept. 28 at her home in Potomac. She had myelodysplastic syndrome, a blood disorder. Mrs. Srour was born in Watford, England. She received an honors... Hyattsville; three sons, Patrick DiGennaro of Silver Spring, Tony DiGennaro and Terry DiGennaro, both of Mount Airy; a sister; three grandchildren and one step-grandchild.

RUFFIN, ERIC D., SR.
9/4/1961 – 10/4/2003
"It's been a year since you left, but you will always be in our hearts. Love Always, Your wife, Cheryl and Daughters, Aaliyah and Tiyah Ruffin."

The George Washington University... Navy General Line School, Monterey, CA and the U.S. Naval War College, Newport, RI. Captain Blanchard is survived by two sons and their families. Commander Frank M. Blanchard, U.S. Navy (Retired), his wife...

Lucy H. Spelman... that she will... That answer... a congressional... was made public... animal care, which... interim report... facility failed... section had an... ad lapses that... its 2,600 animal... and veterinarians... Smithsonian... M. Small to... though she had... sonian search... man became... acre complex... Northwest... he was turning a staggering fa... her scant... agement style... sees the zoo... by January. If... able, officials... it's departure... of the year... a Smithsonian... stay on. She... sition at the... director is...

RE: Rosario A. Fiorani, Reference Letter,
CR-98-0340-A

Dear Judge Cacheris:

    I am James Jones, a friend of Rosario "Ross" A. Fiorani, Jr.. I am writing to request leniency in the criminal matter before you. Ross has always impressed me as a generous and compassionate human being. I hope you will not accept his guilty plea to the felony charge.

    I have known Ross for 4 years since we both worked on a NASD project in Chantilly, VA. Ross afrom the first impressed me as a generous compassionate and likeable person. Having said that I must confess that he has a personality that can iritate and exasperate anyone. He had a penchant for confessing his perceived personal failures to others and seeking their symphathy. He also was constantly seeking to enrich himself through filing lawsuits. I believe that Ross is facing a felony charge before your court because he rubbed someone the wrong way not because any actual crime was committed. I have no specific knowledge of the

facts in this matter, but I know the man. I believe he annoyed the car dealership by threatening to pursue a law suit against it.

I believe that the use of a federal criminal statute to punish someone for annoying behavior is a misuse of federal law. In Virginia, convicted felons lose the right to vote in state or federal elections, to own a gun, obtain state or federal employment. I am sure that he would suffer a greater loss of liberty because of civil sanctions, I am not aware of. He would also have a lifetime stigma because everytime he seeks employment, applies for a loan, a driver's license, seeks housing he would be forced to disclose that he was a convicted felon. I believe that annoying behavior such as threatening legal action does not justify a felony conviction. I respectfully request the court to either reject the plea, or take it under advisement or some action that will spare Ross a lifetime stigma.

Sincerely,

James Jones