RECEIVED
SEP 13 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

ROSARIO A. FIORANI, JR.
    PLAINTIFF, PRO-SE

v.                                   CIVIL ACTION NO: <u>06 - 0739 RWR</u>

UNITED STATES OF AMERICA
DAVID HACKNEY, ESQ.,
GLEN A. TRIMPER, ESQ.
INTERNAL REVENUE SERVICE AGENTS
 JOHN WANAT, SPEC. AGT. CID; AND
 KEVIN DAVIES, SPEC. AGT, CID
AND
 JASON MINARD
     DEFENDANTS, ET AL

## ERRATA

To the Clerk of this District Court:

Enclosed is the corrected sized exhibit for Plaintiff's Reply Against the Government's Motion to Dismiss, Exhibit 15, (anywhere within that exhibit), regarding the Government's past knowledge of judicial and prosecutorial misconduct as exhibited in this case by AUSA David HACKNEY and Judge CACHERIS, regarding criminal and civil violations of Plaintiff's Due Process Rights, Civil and Constitutional Rights under the Bill of Rights.

*Rosario A. Fiorani Jr.*

Rosario A. Fiorani, Jr.
Plaintiff, Pro-Se
7115 Latour Court
Kingstowne, VA  22315
(703) 719-0272

7115 Latour Court
Kingstowne, VA  22315
(703) 719-0272

# Misconduct Cases Rise At Justice Department

### Reno Has Sought to Resolve Allegations Faster

By Jim McGee
Washington Post Staff Writer

Last fall one of the country's most respected trial judges delivered a hard blow to the Justice Department. U.S. District Court Judge William Hoeveler accused one of Justice's veteran prosecutors of "bad faith," and overturned guilty verdicts in a huge savings and loan fraud case.

After sitting through the three-month trial, the judge said he realized the government had no credible evidence against the defendant. He criticized the conduct of a federal prosecutor and said the prosecutor had withheld crucial exculpatory evidence in order to prevail in a weak case.

"The enthusiasm and aggressiveness with which the prosecution pursued this case was certainly commendable, at least in its early stages," Hoeveler said. "Unfortunately, that aggressiveness ultimately led to excesses."

Hoeveler's conclusion offered new support for the old claim by defense attorneys that federal prosecutors routinely hold back evidence that will hurt their case. It also poses a new challenge for the department's overburdened Office of Professional Responsibility (OPR), which Attorney General Janet Reno has sought to make more accountable and adhere to stricter guidelines.

And now a newly released annual report—covering OPR activity for fiscal 1994—shows that the number of confirmed cases of professional misconduct continues to rise, tripling from seven in 1993 to 22 in 1994. Currently, OPR counsel Michael E. Shaheen Jr. says, more than 100 significant cases are under active investigation by the 17-lawyer OPR staff.

"The [1994] increase was partially attributable to the greater number of attorney matters closed during fiscal year 1994 [407 vs. 243]," Shaheen said. He also pointed to the near doubling of federal prosecutors during the 1980s, the use of misconduct claims as a defense tactic, the addition of more lawyers to OPR's staff, Reno's push to have serious allegations resolved more rapidly and the federal judiciary's growing impatience with cases that appear to offend notions of fairness.

"Our job is to vindicate a lawyer when they've been unfairly or inappropriately accused, but to address allegations when they're substantiated," Shaheen said. "It's in the interests of the department to call out those that don't belong here."

After taking office, Reno faced a large backlog of OPR cases left over from the Bush administration. Despite an increase in the number of federal prosecutors, the tiny six-lawyer OPR staff had not grown in size since 1979. Three years into the job, Reno has added lawyers to the OPR staff and made it a high priority. Reno said, "We still have a ways to go, but are pleased with the substantial progress we have made so far."

Nonetheless, after three years Reno has her own inventory of problematic cases.

For example, last year a massive drug racketeering case in Utah, which reportedly cost $10 million to prepare, collapsed after a judge said the evidence failed to support the main charge, prompting the jury to



FILE PHOTO
**JANET RENO**
. . . pressed accountability standards

She has tried to layer in funding for the internal watchdog units at the Justice Department, which include OPR, the Office of Intelligence Policy and Review and the Office of Inspector General.

In an effort to bring greater openness to the discipline process, Reno implemented a policy that allows public summaries of important OPR cases to be released, but the disclosures are moving at a glacial pace. In fiscal 1994, OPR completed a review of 407 cases involving attorney misconduct—sustaining 22 allegations. Twelve public summaries have been released.

"OPR was asked to expedite the public release of information about high-visibility matters in which the public had the greatest interest and it has responded well," said department spokesman Carl Stern. "In the last three working days it has put out three reports naming names and explaining in detail the conclusions it has reached."

Two of the department's most problematic summaries that have yet to be released include the 1989 case in Chicago when three trial judges overturned convictions against the notorious street gang, the El Rukns. The judges concluded that the prosecutor, Assistant U.S. Attorney William R. Hogan Jr. "withheld" exculpatory evidence and "suborned perjury" from government witnesses.

The other was an international heroin trafficking case in California that went bad after a prisoner from China, Wang Zong Xiao, was brought to the United States by Chinese authorities to testify for the government in a drug case.

During the trial Wang admitted from the witness stand that his testimony was false. Later, U.S. District Court Judge William H. Orrick found that Chinese authorities used cattle prods, repeated beatings and threats of execution to obtain his confession.

Recently the 9th U.S. Circuit Court of Appeals affirmed Orrick's findings. "Members of the prosecution team were aware of human rights abuses occurring in [China] and suspected that Wang might have been tortured when he gave his confession," the court's opinion read. "Nonetheless, the prosecution ignored this evidence, failed to disclose any of it to the defense counsel and arranged for Wang to testify."

Like many of the most serious OPR cases, the Wang case touches upon a larger issue for the department. In an effort to combat foreign

---

Anyway, now if you can't figure out how to buy the government for the rest of the year, or an omnibus welfare or health care reform, you might as well kill trying to amend the Constitution.

Especially when the ready looks like the menu in a Chinese restaurant. As of last week, senators and House members filed 139 proposed constitutional amendments during the current Congress—and there are nine nine months to go!

They've got proposed amendments addressing school prayer, busing and abortion; want to get rid of the Electoral College, change the meaning of citizenship and abolish the death penalty.

There are at least 26 prescriptions for balancing the budget, and those who want more can back the "Public 1" amendment proposed by Rep. Owen B. Pickett (D-Va.), requiring a national referendum whenever the feds want to borrow beyond a certain limit. How's that for squatting on federal spending?

Suspicions that a constitutional amendathon was in the works surged in 1995 with the arrival of the first Republican Congress in four decades. Disgusted with the left turn the republic took in their absence, the new kids madly second-guessing the Founding Fathers a couple centuries after the fact.

Well, a little research shows perception to be a vicious and twisted exaggeration, probably perpetrated by Democrats. Congress loves to amend the Constitution.

Back in the 1960s and 1970s, lawmakers routinely filed more than 300 amendments, topping in 1969 with 772. And even the last stale Democratic deca...

## Postmaster Sticks With Stamp Vow

### Runyon Says He'll To Keep Rates Ste

By Bill McAllister
Washington Post Staff Writer

Postmaster General Marvin Runyon yesterday reconfirmed earlier pledge to avoid the price of a stamp next year promised he will attempt to keep the 32-cent stamp until the 2000.

"You have my word: There be no increase in stamp through 1997," Runyon told National Postal Forum in Anaheim, Calif. He also said the age set "an unprecedented keeping rates level for five a row.

But that will require change and breakthrough mance" he told the gathering commercial mailers. His also will keep the pressure Postal Service and its work curtail costs and to find a revenues for the federal perhaps through new products.

Congressional staffers terday the agency has not Hill that it intends to begin an electronic funds trans tem in California and Te will allow postal customer money to Mexico instead ing postal money orders.

The postmaster general other goal, one that ha

And now a newly released annual report—covering OPR activity for fiscal 1994—shows that the number of confirmed cases of professional misconduct continues to rise, tripling from seven in 1993 to 22 in 1994. Currently, OPR counsel Michael E. Shaheen Jr. says, more than 100 significant cases are under active investigation by the 17-lawyer OPR staff.

"The [1994] increase was partially attributable to the greater number of attorney matters closed during fiscal year 1994 [407 vs. 243]," Shaheen said. He also pointed to the near doubling of federal prosecutors during the 1980s, the use of misconduct claims as a defense tactic, the addition of more lawyers to OPR's staff, Reno's push to have serious allegations resolved more rapidly and the federal judiciary's growing impatience with cases that appear to offend notions of fairness.

"Our job is to vindicate a lawyer when they've been unfairly or inappropriately accused, but to address allegations when they're substantiated," Shaheen said. "It's in the interests of the department to call out those that don't belong here."

After taking office, Reno faced a large backlog of OPR cases left over from the Bush administration. Despite an increase in the number of federal prosecutors, the tiny six-lawyer OPR staff had not grown in size since 1979. Three years into the job, Reno has added lawyers to the OPR staff and made it a high priority. Reno said, "We still have a ways to go, but are pleased with the substantial progress we have made so far."

Nonetheless, after three years Reno has her own inventory of problematic cases.

For example, last year a massive drug racketeering case in Utah, which reportedly cost $10 million to prepare, collapsed after a judge said the evidence failed to support the main charge, prompting the jury to acquit the defendant. The department declined to appeal, the local U.S. attorney said, because of credibility problems with the government witnesses. It is not clear how the case got through the review process at the Criminal Division and was approved by the U.S. attorney in Utah.

Shaheen said Reno insists that OPR look hard at the department managers during its inquiries. "She wants to supervise the whole account," Shaheen said, and have them ask, "How could this have happened, if you were doing your job right?"

Reno also has tried to shore up the internal affairs process in ways that would win the confidence of the federal judiciary without alienating her core constituency of 7,000 federal prosecutors.

tions. Twelve public summaries have been released.

"OPR was asked to expedite the public release of information about high-visibility matters in which the public had the greatest interest and it has responded well," said department spokesman Carl Stern. "In the last three working days it has put out three reports naming names and explaining in detail the conclusions it has reached."

Two of the department's most problematic summaries that have yet to be released include the 1989 case in Chicago when three trial judges overturned convictions against the notorious street gang, the El Rukns. The judges concluded that the prosecutor, Assistant U.S. Attorney William R. Hogan Jr. "withheld" exculpatory evidence and "suborned perjury" from government witnesses.

The other was an international heroin trafficking case in California that went bad after a prisoner from China, Wang Zong Xiao, was brought to the United States by Chinese authorities to testify for the government in a drug case.

During the trial Wang admitted from the witness stand that his testimony was false. Later, U.S. District Court Judge William H. Orrick found that Chinese authorities used cattle prods, repeated beatings and threats of execution to obtain his confession.

Recently the 9th U.S. Circuit Court of Appeals affirmed Orrick's findings. "Members of the prosecution team were aware of human rights abuses occurring in [China] and suspected that Wang might have been tortured when he gave his confession," the court's opinion read. "Nonetheless, the prosecution ignored this evidence, failed to disclose any of it to the defense counsel and arranged for Wang to testify."

Like many of the most serious OPR cases, the Wang case touches upon a larger issue for the department. In an effort to combat foreign drug cartels, ethnic mafias and terrorist groups, Reno is aggressively trying to expand the Justice Department's role overseas. This week she is in Budapest with FBI Director Louis J. Freeh to celebrate the first anniversary of a U.S.-backed police training academy.

But the Wang case also points to the difficulties that can arise when U.S. authorities conduct joint efforts with other countries. Experts testified that Chinese authorities routinely torture criminal suspects to obtain confessions. Such practices could complicate plans by the FBI and the Drug Enforcement Agency to station agents in Beijing, where they would be working with Chinese authorities on criminal cases.

## Postma[ster] Sticks [to] Stamp

*Runyon Say[s]*
*To Keep Rat[es]*

By Bill Mc[...]
Washington Post

Postmaster Gen[eral] Runyon yesterday ea[r]lier pledge to the [p]rice of a stam[p] prom[is]ed he will a[t] the 32[-]cent stamp 2000.

"You ha[v]e my w[ord] be no incr[e]ase i[n] through 199[9]," R[unyon] National Posta[l Fo]r[um] Calif. He also s[ai]d set "an unprece[dented] keeping rates lev[el] a row.

But that w[i]ll r[equire] change and [b]reak[ing] mance" he told th[e] commerc[ia]l mailer also will [k]eep the [...] Postal [S]ervice and curta[il] costs and t[o] reve[n]ues for the [...] pe[r]haps through ne[w] [C]ongressional st[...] [y]erday the agency [...] [H]ill that it intends [to] a[n] electronic fund[s] te[m] in California [...] will [a]llow postal cu[stomers] mone[y] to Mexico i[n] ing po[s]tal money or[ders]

The [p]ostmaster other go[al], one t[hat] previous p[o]stmaste[rs] pledged to [h]ave del[ivered] placed on all [f]irst-c[lass] end of 1998. [...] to sort mail a[nd] chines rather t[han] sort the mail.

Former p[o]stmas[ter] thony M. [F]rank [...] that the [a]gency [...] percent [of] its letter by 199[6], but post[...] said o[n]ly 67 perce[nt] was [b]ar-coded duri[ng] Tha[t] had led to m[...] the[/] agency's $4.7 ti[o]n program, whi[ch] f[u]nded yesterday. [s]hort of a revolutio[n] mailers.

# Misconduct Cases Rise At Justice Department

## Reno Has Sought to Resolve Allegations Faster

By Jim McGee
Washington Post Staff Writer

Last fall one of the country's most respected trial judges delivered a hard blow to the Justice Department. U.S. District Court Judge William Hoeveler accused one of Justice's veteran prosecutors of "bad faith," and overturned guilty verdicts in a huge savings and loan fraud case.

After sitting through the three-month trial, the judge said he realized the government had no credible evidence against the defendant. He criticized the conduct of a federal prosecutor and said the prosecutor had withheld crucial exculpatory evidence in order to prevail in a weak case.

"The enthusiasm and aggressiveness with which the prosecution pursued this case was certainly commendable, at least in its early stages," Hoeveler said. "Unfortunately, that aggressiveness ultimately led to excesses."

Hoeveler's conclusion offered new support for the old claim by defense attorneys that federal prosecutors routinely hold back evidence that will hurt their case. It also poses a new challenge for the department's overburdened Office of Professional Responsibility (OPR), which Attorney General Janet Reno has sought to make more accountable and adhere to stricter guidelines.

And now a newly released annual report—covering OPR activity for fiscal 1994—shows that the number of confirmed cases of professional misconduct continues to rise, tripling from seven in 1993 to 22 in 1994. Currently, OPR counsel Michael E. Shaheen Jr. says, more than 100 significant cases are under active investigation by the 17-lawyer OPR staff.

"The [1994] increase was partially attributable to the greater number of attorney matters closed during fiscal year 1994 [407 vs. 243]," Shaheen said. He also pointed to the near doubling of federal prosecutors during the 1980s, the use of misconduct claims as a defense tactic, the addition of more lawyers to OPR's staff, Reno's push to have serious allegations resolved more rapidly and the federal judiciary's growing impatience with cases that appear to offend notions of fairness.

"Our job is to vindicate a lawyer when they've been unfairly or inappropriately accused, but to address allegations when they're substantiated," Shaheen said. "It's in the interests of the department to call out those that don't belong here."

After taking office, Reno faced a large backlog of OPR cases left over from the Bush administration. Despite an increase in the number of federal prosecutors, the tiny six-lawyer OPR staff had not grown in size since 1979. Three years into the job, Reno has added lawyers to the OPR staff and made it a high priority. Reno said, "We still have a ways to go, but are pleased with the substantial progress we have made so far."

Nonetheless, after three years Reno has her own inventory of problematic cases.

For example, last year a massive drug racketeering case in Utah, which reportedly cost $10 million to prepare, collapsed after a judge said the evidence failed to support the main charge, prompting the jury to acquit the defendant. The depart-



**JANET RENO**
... *pressed accountability standards*

She has tried to layer in funding for the internal watchdog units at the Justice Department, which include OPR, the Office of Intelligence Policy and Review and the Office of Inspector General.

In an effort to bring greater openness to the discipline process, Reno implemented a policy that allows public summaries of important OPR cases to be released, but the disclosures are moving at a glacial pace. In fiscal 1994, OPR completed a review of 407 cases involving attorney misconduct—sustaining 22 allegations. Twelve public summaries have been released.

"OPR was asked to expedite the public release of information about high-visibility matters in which the public had the greatest interest and it has responded well," said department spokesman Carl Stern. "In the last three working days it has put out three reports naming names and explaining in detail the conclusions it has reached."

Two of the department's most problematic summaries that have yet to be released include the 1989 case in Chicago when three trial judges overturned convictions against the notorious street gang, the El Rukns. The judges concluded that the prosecutor, Assistant U.S. Attorney William R. Hogan Jr. "withheld" exculpatory evidence and "suborned perjury" from government witnesses.

The other was an international heroin trafficking case in California that went bad after a prisoner from China, Wang Zong Xiao, was brought to the United States by Chinese authorities to testify for the government in a drug case.

During the trial Wang admitted from the witness stand that his testimony was false. Later, U.S. District Court Judge William H. Orrick found that Chinese authorities used cattle prods, repeated beatings and threats of execution to obtain his confession. Recently the 9th U.S. Circuit Court of Appeals affirmed Orrick's findings. "Members of the prosecution team were aware of human rights abuses occurring in [China] and suspected that Wang might have been tortured when he gave his confession," the court's opinion read. "Nonetheless, the prosecution ignored this evidence, failed to disclose any of it to the defense counsel and arranged for Wang to testify."

Like many of the most serious OPR cases, the Wang case touches upon a larger issue for the department. In an effort to combat foreign

---

And why not? If you can't do how to find the government for the rest of the year, or an omnibus welfare or health care reform, you might as well ki trying to amend the Constitu

Especially when the ready looks like the menu in a Chi restaurant. As of last week, senators and House membe filed 139 proposed constitut amendments during the cur Congress—and there are ne nine months to go!

They've got proposed amendments addressing sch prayer, busing and abortion want to get rid of the Electo College, change the meanin citizenship and abolish the d penalty.

There are at least 26 prescriptions for balancing budget, and those who wa more can back the "Public amendment proposed by R Owen B. Pickett (D-Va), re a national referendum whei the feds want to borrow be certain limit. How's that fo squatting on federal spendi

Suspicions that a constit amendathon was in the wor surged in 1995 with the ar the first Republican Congre four decades. Disgusted w left turn the republic took their absence, the new kid madly second guessing the Founding Fathers a couple centuries after the fact.

Well, a little research sh perception to be a vicious a twisted exaggeration, prob perpetrated by Democrats Congress loves to amend tl Constitution.

Back in the 1960s and 1 lawmakers routinely filed that 300 amendments, top in 1969 with 772. And eve last stale Democratic deca

# Postmaster Sticks Wit Stamp Vo

## Runyon Says He'l To Keep Rates Ste

By Bill McAllister
Washington Post Staff Writer

Postmaster General Ma Runyon yesterday reconfir earlier pledge to avoid b the price of a stamp next y promised he will attempt t the 32-cent stamp until t 2000.

"You have my word: Th be no increase in stamp through 1997," Runyon t National Postal Forum in A Calif. He also said the age set "an unprecedented keeping rates level for five a row.

But that will require change and breakthrough mance" he told the gath commercial mailers. His also will keep the pressur Postal Service and its wo curtail costs and to find a revenues for the federal perhaps through new prod

Congressional staffers terday the agency has no Hill that it intends to begi an electronic funds tran tem in California and Te will allow postal customer money to Mexico instead ing postal money orders.

The postmaster gener other goal, one that ha

And now a newly released annual report—covering OPR activity for fiscal 1994—shows that the number of confirmed cases of professional misconduct continues to rise, tripling from seven in 1993 to 22 in 1994. Currently, OPR counsel Michael E. Shaheen Jr. says, more than 100 significant cases are under active investigation by the 17-lawyer OPR staff.

"The [1994] increase was partially attributable to the greater number of attorney matters closed during fiscal year 1994 [407 vs. 243]," Shaheen said. He also pointed to the near doubling of federal prosecutors during the 1980s, the use of misconduct claims as a defense tactic, the addition of more lawyers to OPR's staff, Reno's push to have serious allegations resolved more rapidly and the federal judiciary's growing impatience with cases that appear to offend notions of fairness.

"Our job is to vindicate a lawyer when they've been unfairly or inappropriately accused, but to address allegations when they're substantiated," Shaheen said. "It's in the interests of the department to call out those that don't belong here."

After taking office, Reno faced a large backlog of OPR cases left over from the Bush administration. Despite an increase in the number of federal prosecutors, the tiny six-lawyer OPR staff had not grown in size since 1979. Three years into the job, Reno has added lawyers to the OPR staff and made it a high priority. Reno said, "We still have a ways to go, but are pleased with the substantial progress we have made so far."

Nonetheless, after three years Reno has her own inventory of problematic cases.

For example, last year a massive drug racketeering case in Utah, which reportedly cost $10 million to prepare, collapsed after a judge said the evidence failed to support the main charge, prompting the jury to acquit the defendant. The department declined to appeal, the local U.S. attorney said, because of credibility problems with the government witnesses. It is not clear how the case got through the review process at the Criminal Division and was approved by the U.S. attorney in Utah.

Shaheen said Reno insists that OPR took hard at the department managers during its inquiries. "She wants to supervise the whole account," Shaheen said, and have them ask, "How could this have happened, if you were doing your job right?"

Reno also has tried to shore up the internal affairs process in ways that would win the confidence of the federal judiciary without alienating her core constituency of 7,000 federal prosecutors.

tions. Twelve public summaries have been released.

"OPR was asked to expedite the public release of information about high-visibility matters in which the public had the greatest interest and it has responded well," said department spokesman Carl Stern. "In the last three working days it has put out three reports naming names and explaining in detail the conclusions it has reached."

Two of the department's most problematic summaries that have yet to be released include the 1989 case in Chicago when three trial judges overturned convictions against the notorious street gang, the El Rukns. The judges concluded that the prosecutor, Assistant U.S. Attorney William R. Hogan Jr. "withheld" exculpatory evidence and "suborned perjury" from government witnesses.

The other was an international heroin trafficking case in California that went bad after a prisoner from China, Wang Zong Xiao, was brought to the United States by Chinese authorities to testify for the government in a drug case.

During the trial Wang admitted from the witness stand that his testimony was false. Later, U.S. District Court Judge William H. Orrick found that Chinese authorities used cattle prods, repeated beatings and threats of execution to obtain his confession.

Recently the 9th U.S. Circuit Court of Appeals affirmed Orrick's findings. "Members of the prosecution team were aware of human rights abuses occurring in [China] and suspected that Wang might have been tortured when he gave his confession," the court's opinion read. "Nonetheless, the prosecution ignored this evidence, failed to disclose any of it to the defense counsel and arranged for Wang to testify."

Like many of the most serious OPR cases, the Wang case touches upon a larger issue for the department. In an effort to combat foreign drug cartels, ethnic mafias and terrorist groups, Reno is aggressively trying to expand the Justice Department's role overseas. This week she is in Budapest with FBI Director Louis J. Freeh to celebrate the first anniversary of a U.S.-backed police training academy.

But the Wang case also points to the difficulties that can arise when U.S. authorities conduct joint efforts with other countries. Experts testified that Chinese authorities routinely torture criminal suspects to obtain confessions. Such practices could complicate plans by the FBI and the Drug Enforcement Agency to station agents in Beijing, where they would be working with Chinese authorities on criminal cases.

# Postm[a]
# Sticks
# Stamp

*Runyon Sa[ys]*
*To Keep Ra[...]*

By Bill M[...]
Washington Pos[t]

Postmaster Ge[neral] Runyon yesterday [...] earlier pledge to [...] the price of a stan[dard...] promised he will a[...] the 32-cent stamp [...] 2000.

"You have my v[...] be no increase i[n...] through 199[...]," [...] National Postal Fo[rum...] Calif. He also said [...] set "an unprece[dented...] keeping rates lev[el...] a row.

But that will r[...] change and break [...] mance" he told t[he...] commercial mailer[s...] also will keep the [...] Postal Service and [...] curtail costs and t[...] revenues for the [...] perhaps through n[...] Congressional s[...] terday the agency [...] Hill that it intends [...] an electronic fund [...] ters in California [...] will allow postal cu[stomers...] money to Mexico i[...] ing postal money o[rders...]

The postmaster [...] other goal, one th[at...] previous postmast[er...] pledged to have del[ivery...] placed on all first-c[lass...] end of 1998. The [...] to sort mail and [...] chines rather than [...] sort the mail.

Former postmast[er An]thony M. Frank c[...] that the agency w[...] percent of its letter [...] by 1996, but post[...] said only 67 perce[nt...] was bar-coded duri[ng...] That had led to m[...] the agency's $4.7 [...] tion program, whic[h...] funded yesterday. [...] short of a revolutio[n...] mailers.